## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

—————————————————————— x
:
N.S., *individually and on behalf of all others* :
*similarly situated*, :
    c/o The Public Defender Service :
    for the District of Columbia :
    633 Indiana Avenue, N.W. :
    Washington, D.C. 20004 :
:
:
           Plaintiff, :
:
      v. : Civil Action No. _____
:
MICHAEL A. HUGHES, United States :
Marshal, District of Columbia (Superior Court), :
in his official capacity :
    Superior Court for the District of Columbia :
    500 Indiana Ave., N.W. :
    Washington, D.C. 20001 :
:
          Defendant. :
—————————————————————— x

## MOTION FOR A PRELIMINARY INJUNCTION

Plaintiff N.S., on behalf of the proposed class, respectfully moves pursuant to Federal Rule of Civil Procedure 65 for interim injunctive relief prohibiting Defendant and its subordinates, agents, employees, from seizing individuals for suspected civil immigration violations and enjoining them from undertaking such arrests.  Plaintiff asks that the briefing on this motion be expedited to permit this Court to resolve the motion for interim relief as quickly as possible.  A memorandum of law in support of this motion is attached.

Dated: January 14, 2020
        Washington, D.C.

                        Respectfully submitted,


                        /s/ Steven Marcus*_____

                        Steven Marcus (D.C. Bar # 1630882)
                        Public Defender Service
                        633 Indiana Avenue N.W.
                        Washington, D.C. 20004
                        Tel. 202-824-2524
                        Fax 202-824-2525
                        *smarcus@pdsdc.org*


In accordance with D.D.C. Local Civil Rule 83.2(g), the attorney whose name is marked with an asterisk above certifies that: (i) he is a member in good standing of the District of Columbia bar; (ii) he is representing a petitioner who is indigent within the meaning of Local Rule 83.2(g), at no cost to petitioner; (iii) he has never been subject to disciplinary complaint or sanction by any court or other disciplinary authority; (iv) he possesses a copy of the Local Rules of this District and is familiar with the rules generally and as they pertain to this proceeding.

Dated: January 14, 2020

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

```
_____ x
                                       :
N.S., individually and on behalf of all others   :
similarly situated,                    :
      c/o The Public Defender Service  :
      for the District of Columbia     :
      633 Indiana Avenue, N.W.         :
      Washington, D.C. 20004           :
                                       :
                                       :
                   Plaintiff,          :
                                       :
                                       :    Civil Action No. _____
           v.                          :
                                       :
MICHAEL A. HUGHES, United States       :
Marshal, District of Columbia (Superior Court), :
in his official capacity               :
      Superior Court for the District of Columbia :
      500 Indiana Ave., N.W.           :
      Washington, D.C. 20001           :
                                       :
                   Defendant.          :
_____ x
```

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S
## MOTION FOR A PRELIMINARY INJUNCTION

The Immigration and Nationality Act and its attendant regulations carefully establish a system of enforcement for civil immigration law. Under that system, only specifically-designated, trained, certified immigration officers are entrusted with the expansive powers of civil immigration law enforcement — powers that include arresting and detaining individuals suspected of *civil* law violations. Officers of the United States Marshals Service are not such officers. By engaging in an ongoing policy and practice of civil immigration law enforcement, the Marshals Service exceeds its delegated authority and disrupts the enforcement scheme that Congress carefully established. This proposed class action asks the Court to enjoin this unlawful policy and practice.

Pursuant to Federal Rule of Civil Procedure 65, Plaintiff N.S. asks this Court, on behalf of all others similarly situated, to preliminary enjoin officers of the United States Marshals Service ("USMS" or "Marshals Service") from exceeding their statutory authority by detaining individuals in Superior Court for suspected civil immigration violations. Based on information and belief, USMS officers routinely detain individuals after a judge of the Superior Court of the District of Columbia ("Superior Court") releases them on bail, or after prosecutors decline to bring criminal charges. *See* Docket No. 1 ("Complaint"). Defendant's actions violate the "laws . . . of the United States" — namely, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 501 *et seq.* — and proposed class members are entitled to the writ of *habeas corpus* and to an injunction ending the Marshals Service's *ultra vires* policy. Because Defendant's policy and practice causes proposed class members irreparable harm, and because the balance of the equities and the public interest favor granting relief, the Court should preliminary enjoin the Marshals Service.

## BACKGROUND

### A. Factual Background

Plaintiff N.S. was arrested on January 13, 2020**.** After appearing before Magistrate Judge Hermann on January 14, 2020, Plaintiff was released on his own recognizance. Magistrate Judge Hermann released N.S. and ordered him to return to court, on his own recognizance, on January 27, 2020. In so doing, Magistrate Judge Hermann found that N.S. does not pose a risk of flight and is not a danger to the community. After Magistrate Judge Hermann released Plaintiff, he was detained by officers of the Marshals Service, who claimed that N.S. has an "ICE hold."

### B. Statutory Background

#### i.     *The authority of the Marshals Service*

The United States Marshals Service is "a bureau within the Department of Justice under the authority and direction of the Attorney General."  28 U.S.C. § 564.  The present-day "core mission" of the Marshals Service (which aligns with historical practice[1]) is "to ensure the safe, effective functioning of the Federal judicial process." U.S. MARSHALS SERV., FY 2019 PERFORMANCE BUDGET 7 (2018); *see also United States v. Johnson*, 196 F.3d 1000, 1007 (9th Cir. 1999) ("The marshal's 'primary' role is to provide security for and enforce orders of federal courts." (quoting 28 U.S.C. § 566(a)).  To that end, the Marshals Service describes its mission as "to provide Federal judicial security; apprehend fugitives and non-compliant sex offenders; secure and transport Federal prisoners; execute Federal court orders; seize and manage assets forfeited to the government; and assure the safety of endangered government witnesses and their families."  U.S. MARSHALS SERV., FY 2019 PERFORMANCE BUDGET 6.

The authority of the USMS to carry out its mission is provided for by statute.  Specifically, the USMS "shall execute all lawful writs, process, and orders issued under the authority of the United States," 28 U.S.C. § 566(c), such as writs of *habeas corpus* and orders of "United States District Courts, the United States Courts of Appeals, the Court of International Trade, and the United States Tax Court," *id.* § 566(a); *see, e.g., Ford v. Allen*, 728 F.2d 1369, 1370 (11th Cir. 1984) (holding that Section 566(c) required the Marshals Service to comply with a writ of *habeas corpus ad*

---

[1]     The position of United States Marshal was first provided for in the Judiciary Act of 1789, which called for a "marshal" to be appointed in each judicial district, to serve two principle duties: "to attend the district and circuit courts when sitting therein" and to "execute . . . all lawful precepts directed to [the Marshal]."  Judiciary Act of 1789, ch. 20, § 27, 1 Stat. 87.  In the early days after the founding, the marshals "became Federal administration 'handymen'" who were "directed to take the census and to supervise jails for Federal prisoners."  REPORT BY THE COMPTROLLER GENERAL, U.S. MARSHALS' DILEMMA: SERVING TWO BRANCHES OF GOVERNMENT (1982).  In 1969, the Attorney General established the USMS as a bureau within the Department of Justice.  *See* Dep't of Justice, Order 415-69.

*testificandum*); *Graham v. Satkoski*, 51 F.3d 710, 712 (7th Cir. 1995) (holding that Section 566(c) "require[s] [USMS officers] to serve process on behalf of individuals proceeding *in forma pauperis*").

A USMS officer is also authorized to "make arrests without warrant for any offense against the United States committed in his or her presence, or for any felony cognizable under the laws of the United States if he or she has reasonable grounds to believe that the person to be arrested has committed or is committing such felony." 28 U.S.C. § 566(d); *see also id.* § 3053 (same). Finally, when USMS officials are "executing the laws of the United States within a State, [they] may exercise the same powers which a sheriff of the State may exercise in executing the laws thereof." *Id.* § 564.

The Attorney General has also promulgated regulations delegating certain functions to the USMS. *See* 28 C.F.R. § 0.111. Under those regulations, USMS officers administer and implement "courtroom security requirements for the Federal judiciary," *id.* § 0.111(d), provide "assistance in the protection of Federal property and buildings," *id.* § 0.111(f), and receive, process, and transport "prisoners held in the custody of a marshal," *id.* § 0.111(j), among other related duties.

ii.     *The authority of immigration officers*

The Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101 *et seq.*, entrusts immigration enforcement functions to "immigration officers," 8 U.S.C. § 1357, which the INA defines as "any employee or class of employees of the Service or of the United States designated by the Attorney General," *id.* § 1101(a)(18).[2] The "Service" in this provision and throughout the INA refers to the

---

[2]     The INA's authorization of only particular officials to enforce federal immigration law is consistent with historical practice. From the earliest days of immigration regulation, the enforcement of federal immigration law has been the exclusive province of specific federal agencies. The Immigration Act of 1882, considered the first general immigration law, authorized the Secretary of the Treasury to "supervis[e] the business of immigration to the United States." Act of Aug. 3, 1882, ch. 376, § 2, 22 Stat. 214. The Immigration Act of 1891 went a step further, establishing "the office of superintendent of immigration" within the Department of Treasury. Act of March 3, 1891, ch. 551, § 7, 26 Stat. 1085. In 1903, this office was reorganized from the Department of Treasury into the newly-created Department of Commerce and Labor, Act of Feb. 14, 1903, ch. 552, § 2, 32 Stat. 826,

Immigration and Naturalization Service, the predecessor agency to Immigration and Customs Enforcement ("ICE"). *See Moreno v. Napolitano*, 213 F. Supp. 3d 999, 1006 n.3 (N.D. Ill. 2016) (noting that ICE is the successor to the Immigration and Naturalization Service referenced in 8 U.S.C. § 1357(a)).

The authority of immigration officers to detain noncitizens without a warrant is further delineated by the INA: Section 1357, titled "Powers of immigration officers and employees," grants "[a]ny officer or employee of *the Service* authorized under regulations prescribed by the Attorney General" the power to "arrest any alien in the United States, if they have reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2) (emphasis added); *see also* 8 C.F.R. § 287.8(c)(2)(i) ("An arrest shall be made only when the designated immigration officer has reason to believe that the person to be arrested has committed an offense against the United States or is an alien illegally in the United States.").

The INA also authorizes immigration officials to issue "detainers." *See* 8 U.S.C. § 1357(d). Regulations define detainers as "request[s] that [an agency with custody of an alien] advise the Department [of Homeland Security], prior to release of the alien, in order for the Department to arrange to assume custody, in situations when gaining immediate physical custody is either impracticable or impossible." 8 C.F.R. § 287.7(a). If an "alien [is] not otherwise detained by a

---

and renamed the Bureau of Immigration and Naturalization by the Naturalization Act, Act of June 29, 1906, ch. 3592, 34 Stat. 596. By Executive Order in 1933, the agency was renamed the Immigration and Naturalization Service, Exec. Order No. 6166 § 14, *Organization of Executive Agencies* (June 10, 1933), and in 1940, INS was relocated into the Department of Justice, *see* 5 Fed. Reg. 3,502 (Sept. 4, 1940). In 2003, INS was replaced by several agencies, including ICE, which is the agency currently tasked with enforcing immigration laws. *See* Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135.

criminal justice agency," immigration officers may, "[u]pon a determination by the Department [of Homeland Security] to issue a detainer," request that "such agency . . . maintain custody of the alien for a period not to exceed 48 hours . . . in order to permit assumption of custody by the Department." 8 C.F.R. § 287.7(d); *see also Galarza v. Szalczyk*, 745 F.3d 634, 639-43 (3d Cir. 2014) (interpreting 8 C.F.R. § 287.7(d)).

Finally, federal statutes permit the Attorney General to "enter into a written agreement with a State, or any political subdivision of a State," allowing law enforcement officers of that state to "carry out" functions of immigration officers "in relation to the investigation, apprehension, or detention of aliens in the United States." 8 U.S.C. § 1357(g)(1). Under such written agreement, state law enforcement officers participating in this program must obtain a "written certification that the officers . . . performing the function under the agreement have received adequate training regarding the enforcement of relevant Federal immigration laws." *Id.* at § 1357(g)(2).

## ARGUMENT

Preliminary relief is warranted where the party seeking relief makes a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (internal quotation marks omitted). Plaintiff satisfies all of these requirements.[3]

---

[3]     Plaintiff also has moved the Court to provisionally certify the class. *See* Plaintiff's Motion for Class Certification, Docket No. 2. The Court may issue a preliminary injunction irrespective of whether it has previously certified the class that Plaintiff seeks to represent. *See, e.g.*, *Bresgal v. Brock*, 843 F.2d 1163, 1170-71 (9th Cir. 1987) ("[A]n injunction is not necessarily made over-broad by extending benefit or protection to persons other than prevailing parties in the lawsuit — even if it is not a class action — if such breadth is necessary to give prevailing parties the relief to which they are entitled."); *Washington v. Reno*, 35 F.3d 1093, 1104 (6th Cir. 1994) (finding that where relief for named plaintiffs would necessarily extend to all federal inmates, district court did not err in granting "wide-ranging" injunctive relief before certifying nationwide class).

**A. Plaintiff is substantially likely to succeed on the merits of his claims.**

Plaintiff is substantially likely to prevail on his claims. After a judge released Plaintiff on his own recognizance, Plaintiff was seized and detained without a criminal or judicially-authorized warrant, by USMS officers for alleged civil immigration violations. *See* Complaint ¶ 1. USMS officers do not have authority to enforce federal immigration law. Thus, Defendant's policy violates the APA because it is "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

   i.   *Defendant's policy exceeds the authority of the Marshals Service because USMS officers lack authority to make warrantless arrests for suspected civil immigration violations.*

The Marshals Service, like other federal agencies, "literally has no power to act . . . unless and until Congress confers power on it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). The power of USMS officers "is limited to the scope of the authority Congress has delegated" to those officers. *Am. Library Ass'n. v. FCC*, 406 F.3d 689, 698 (D.C. Cir. 2005).

Actions by the Marshals Service are subject to judicial review under the APA. *See, e.g.*, *Atterbury v. U.S. Marshals Serv.*, 805 F.3d 398 (2d Cir. 2015).

   1.   Neither the INA nor its implementing regulations authorize the USMS to detain a
        noncitizen without a warrant.

Defendants' ongoing policy and practice of enforcing civil immigration law is not authorized by the INA or its implementing regulations. Congress did not authorize — explicitly or implicitly — USMS officers to make warrantless arrests for alleged civil immigration infractions. Instead, the INA solely and exclusively delegates arrest and detention authority to "officer[s] or employee[s] of the [ICE]." 8 U.S.C. § 1357(a).

------

The INA does not grant authority to any other law enforcement agency to detain allegedly undocumented persons. As courts interpreting this statute have recognized, the INA explicitly delegates authority to one agency to exercise that broad power. *See, e.g.*, *United States v. Abdi*, 463 F.3d 547, 557 (6th Cir. 2006) ("[Section 1357] authoriz[es] *ICE agents* to arrest persons for immigration violations . . . ." (emphasis added)); *United States v. Chavez*, 705 F.3d 381, 384 (8th Cir. 2013) ("[A]n *immigration official* has the authority, without a warrant . . . to make arrests . . . ." (emphasis added)); *Moreno*, 213 F. Supp. 3d at 1005 (holding that Section 1357(a)(2) "allows for warrantless arrest only if *ICE* has 'reason to believe' that the suspected removable alien 'is likely to escape before a warrant can be obtained for his arrest'" (emphasis added)); *Aguilar v. U.S. Immigration & Customs Enf't Chicago Field Office*, No. 17-CV-2296 (RMD), 2018 WL 4679569, at *7 (N.D. Ill. Sept. 28, 2018) ("The INA allows *ICE officers* to make warrantless arrests . . . ." (emphasis added)); *Mendoza v. Osterberg*, No. 8:13-CV-65 (JFB), 2014 WL 3784141, at *6 (D. Neb. July 31, 2014) ("*Immigration officers* also have authority to arrest without a warrant . . . ." (emphasis added)). The overwhelming weight of precedent comes to this conclusion because of the familiar principle of statutory construction that the inclusion of a specific term — here, the agency to which warrantless arrest power is designated — necessarily excludes other terms. *See United States v. Vonn*, 535 U.S. 55, 65 (2002) (describing the *expressio unius* canon); *Halverson v. Slater*, 129 F.3d 180, 185 (D.C. Cir. 1997) (employing the canon in finding that a statute including delegations to Coast Guard officials means the exclusions of delegations to non-Coast Guard officials). Applying this commonsense canon of statutory construction here leads to the inexorable conclusion that the INA does not grant USMS officers the power to arrest without a warrant.

Critically, Congress specifically addressed in the INA itself whether and when, under the complex immigration scheme it has established, federal agents *other* than ICE can enforce

immigration law. For instance, in Section 1324(c), Congress broadly grants the "[a]uthority to arrest" people suspected of the enumerated offenses of transporting, smuggling, or harboring certain aliens to "all . . . officers whose duty it is to enforce criminal laws." 8 U.S.C. § 1324(c). In another section of the INA, Congress authorized ICE officers to issue detainers "[i]n the case of an alien who is arrested by a Federal . . . law enforcement official" for a violation of controlled substances laws. 8 U.S.C. § 1357(d). These provisions demonstrate that Congress knew how to delegate broad arrest authority, as it did for specific enumerated offenses in Section 1324(c), and how to delegate to Federal law enforcement agents generally, as it did in Section 1357(d). But Congress chose not to enact such a broad delegation of authority for civil immigration violations. In other words, Congress understood that it could have made sweeping delegations of authority for civil immigration violations, but it did not do so; therefore, this Court should not interpret the INA to presume a broad grant of authority when Congress did not so intend. *See Dean v. United States*, 556 U.S. 568, 573 (2009) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

Congress also understood that it could have authorized the Marshals Service to enforce immigration law, but did not do so in the INA, because Congress has granted immigration enforcement powers to the Marshals Service in other legislation. Congress empowered the Marshals Service in the Alien Act of 1798 to "caus[e] a removal" of certain "alien enemies" in the event of a declared war or a foreign invasion. 50 U.S.C. § 24. Under this provision, the Marshals Service arrested and detained hundreds of German-Americans following President Wilson's declaration of war against Germany in 1917. *See* DEP'T OF JUSTICE, ANNUAL REPORT OF THE ATTORNEY GENERAL OF THE UNITED STATES FOR THE YEAR 1917 55-56 (1917). In passing the INA years later and

determining which federal agents should be entrusted with its broad powers, Congress chose not to authorize the Marshals Service, an agency that lacks particular expertise and training in immigration law, and which Congress had previously relied on to enforce other federal laws. Instead, Congress chose only to authorize specifically designated officials — "officer[s] or employee[s] of [ICE]" — to wield the INA's expansive power. 8 U.S.C. § 1357(a). By clearly delegating authority to ICE to arrest allegedly undocumented persons, Congress plainly did not intend to delegate such authority to the USMS.

The relevant Department of Homeland Security ("DHS") regulation also reflects this interpretation of the INA. DHS regulations authorize only "immigration officers who have successfully completed basic immigration law enforcement training" to "exercise the arrest power conferred by section [1357](a)(2)." 8 C.F.R. § 287.5(c)(1). The regulations specify the following "immigration officers" as empowered to make warrantless arrests: border patrol agents, air and marine agents, special agents, deportation officers, Customs and Border Patrol ("CBP") officers, immigration enforcement agents, supervisory and managerial personnel who supervise any of the preceding officers, and certain other "[i]mmigration officers . . . who are designated" by "the Commissioner of CBP, the Assistant Secretary/Director of ICE, or the Director of the USCIS." 8 C.F.R. § 287.5(c)(1)(i)-(viii).

USMS officers are excluded by these regulations — and thus cannot exercise the warrantless arrest power under the INA — for three reasons. First, USMS officers are not "immigration officers." The Marshals Service is not mentioned in the INA, nor does the Marshals Service's enabling legislation mention immigration enforcement authority. *See* 28 U.S.C. §§ 561 *et seq.*

Second, even if USMS officers were "immigration officers," the DHS regulations do not specify USMS officers as among those "immigration officers" who are vested with the warrantless

arrest power.  The list of those officers — including border patrol agents, deportation officers, and CBP officers — does not include USMS officers.  Nor would inclusion of USMS officers make sense, as the officers listed all serve agencies whose primary mission includes immigration enforcement.  *See, e.g.*, 28 C.F.R. § 287.5(c)(1)(vi) (authorizing "[i]mmigration enforcement agents" to make warrantless arrests).

Third, the DHS regulations require that even among those listed immigration officers, only those who have "successfully completed basic immigration law enforcement training" may exercise the warrantless arrest power.  *Id.* § 287.5(c)(1).  That is, even if USMS officers were immigration officers, and even if the DHS regulations enumerated USMS officers as officers endowed with the arrest power, USMS officers would still need to have completed immigration law enforcement training before they could exercise the arrest power under the INA.  Because they have not done so, and because the DHS regulations plainly do not endow the Marshals Service with warrantless arrest power, USMS officers cannot rely on the INA to make immigration arrests.

It would defy history and logic to read the INA to permit agencies other than ICE to detain suspected undocumented noncitizens without a warrant.  As discussed above, federal immigration law has historically been enforced exclusively by specifically designated federal agencies — the Department of Treasury at first, and then the Bureau of Immigration and Naturalization in the Department of Labor, followed by the Immigration and Naturalization Service in the Department of Justice, and its current manifestation, Immigration and Customs Enforcement in the Department of Homeland Security.[4]  Congress has never wholesale delegated immigration enforcement to all federal officers generally.  To suggest otherwise — as one must to justify the Marshals Service's enforcement

---

4       As noted above, the Alien Act of 1798 empowers the Marshals Service with some immigration authority in wartime or during an invasion.  *See* 50 U.S.C. § 24.

of immigration law here — would permit any federal agent to effectuate warrantless arrests of suspected undocumented citizens.  It cannot have been Congress's intent to empower the roughly 120,000 full-time federal law enforcement officers with such power.  *See* U.S. Dep't of Justice, Bureau of Justice Statistics, *Federal Law Enforcement Officers, 2008*, *available at* https://www.bjs.gov/content/pub/pdf/fleo08.pdf.  Taken to its logical conclusion, the argument that all federal law enforcement agencies can enforce civil immigration law would permit, for instance, an officer of the Fish and Wildlife Service's Division of Refuge Law Enforcement to arrest and detain a person whom that officer had probable cause to believe was "in the United States in violation of" immigration law.  8 U.S.C. § 1357(a)(2).  Congress does not "hide elephants in mouseholes," *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006) — legislators would not have dramatically increased the authority of 120,000 federal agents without clearly stating so.  Nor did Congress intend to "alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions," *id.*, by relocating authority that has, for over a century, been held in one agency (ICE and its predecessor agencies) and redistributing it among dozens of other federal agencies. Rather, Congress made the commonsense specification that only ICE be permitted such expansive power. Otherwise, any federal law enforcement officer could detain suspected undocumented noncitizens.

That Congress would intend only trained immigration officers be entrusted with the power to make warrantless arrests makes particular sense, given the Supreme Court's recognition of the "significant complexities involved in enforcing federal immigration law." *Arizona*, 567 U.S. at 408. The structure of the INA demonstrates Congress's manifest concern that only trained officers be endowed with the vast power of enforcing immigration law. The INA specifies an instance when other law enforcement agencies may be deputized to enforce immigration law: Under 8 U.S.C. Section 1357(g), the Attorney General may delegate immigration enforcement authority to "State

12

officers and employees" only pursuant to "written agreement," and only upon a "written certification" that the state officers "have received adequate training regarding the enforcement of relevant Federal immigration laws." 8 U.S.C. § 1357(g). These certifications ensure that "officers have received adequate training to carry out the duties of an immigration officer." *Arizona*, 567 U.S. at 409 (citing 8 U.S.C. § 1357(g)(2)); *see also* 8 C.F.R. § 287.5(c) (arrest power contingent on training); *id.* § 287.1(g) (defining the training). These provisions show Congress's concern that officers enforcing immigration law be properly trained in immigration law. Interpreting the INA to extend such power to untrained, uncertified USMS officers runs counter to Congress's statutory intent.

Finally, even if this Court were to read the INA as granting all federal agents (including USMS officers) the authority to make a warrantless arrest of a suspected undocumented noncitizen, the INA would still not justify the use of that authority as applied to this proposed class. The INA expressly limits the authority to make a warrantless arrest only to circumstances in which the officer "has reason to believe that the alien . . . is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2). "This flight-risk determination is not mere verbiage." *United States v. Pacheco-Alvarez*, 227 F. Supp. 3d 863, 889 (S.D. Ohio 2016). Because "reason to believe" under Section 1357(a)(2) "requires the equivalent of probable cause," *Moreno*, 213 F. Supp. 3d at 1007 (citing *United States v. Cantu*, 519 F.2d 494, 496 (7th Cir. 1975)), warrantless arrests under the INA must be supported by an officer's individualized determination of probable cause that the target of the warrantless arrest is likely to escape, *see id.* (citing *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)).

Here, the USMS officers did not make an individualized determination, supported by probable cause, that Plaintiff is likely to "evade detention by immigration officers." *Id.* at 1008; *see also Arizona*, 567 U.S. at 408 (noting that ICE agents may make warrantless arrests "only where the alien 'is likely to escape before a warrant can be obtained.'" (quoting 8 U.S.C. § 1357(a)(2))). Nor, under

13

these circumstances, could USMS officers make such a finding.   By rejecting the government's request for pre-trial detention, Magistrate Judge Hermann determined that Plaintiff would not "flee or pose a danger to any person or the community."   D.C. Code § 23-1322(a)(2).   It strains credulity that a USMS officer, privy to the same individualized information as the Superior Court judge, could come to the opposite conclusion — that there is probable cause that Plaintiff is likely to evade detention by immigration officers — mere seconds later.   For that reason, and because neither Congress (in the INA) nor DHS (in the INA's implementing regulations) contemplated that USMS officers would make warrantless arrests for civil immigration violations, Defendant's ongoing policy and practice are unlawful.

    2. <u>An immigration detainer does not authorize USMS officers to make a warrantless arrests.</u>

  The government cannot rely on an ICE detainer to subvert the Magistrate Judge's decision to release Plaintiff.   An ICE detainer is not a statutory authorization of detention.   It is not a grant of power to an official.   Nor is it sufficient to establish "probable cause to arrest and detain" Plaintiff. *Morales*, 793 F.3d at 216.   A detainer is simply a "request that another law enforcement agency temporarily detain an alien" to permit ICE to assume custody.   *United States v. Uribe-Rios*, 558 F.3d 347, 350 n.1 (4th Cir. 2009) (citing 8 C.F.R. § 287.7).   Accordingly, ICE cannot use a detainer to provide authority that Congress has not authorized to another law enforcement agency to enforce immigration law.

  As an initial matter, even if an ICE detainer did permit a USMS officer to detain people suspected of civil immigration violations, the USMS officer must have that detainer in his possession at the time of the arrest.   As the Court explained in *Santos*, "the ICE detainer does not cleanse the unlawful seizure, because '[t]he reasonableness of an official invasion of [a] citizen's privacy must be

appraised on the basis of the facts as they existed at the time that invasion occurred.'" 725 F.3d at 466 (quoting *United States v. Jacobsen*, 466 U.S. 109, 115 (1984)). An officer without a detainer in hand at the time of the arrest cannot rely on a subsequently obtained detainer to justify the arrest.

In any event, ICE cannot make an end-run around Congress's limited grant of immigration enforcement authority through the use of detainers, for two separate and independent reasons. First, an ICE detainer does not supply the required probable cause *both* that Plaintiff is "in the United States in violation" of immigration law *and* is "likely to escape before a warrant could be obtained" for his arrest. 8 U.S.C. § 1357(a)(2). Not only does the detainer fail to include that required information, but such a determination would be patently unreasonable in Plaintiff's case because a judge, considering all of the relevant evidenced, found that Plaintiff was *not* a flight risk. The detainer is insufficient to confer authority for that reason alone.

Second, an ICE detainer does not, and cannot, confer any additional authority that the recipient agency does not already possess. Put differently, if the USMS officers did not *already* have authority to detain Plaintiff — and they did not, for the reasons discussed above — an ICE detainer cannot grant officers authority they lack. Even on its own terms, a detainer is a "request[]" that a law enforcement agency maintain custody over a person. *See* Dep't of Homeland Security, Form I-247A: Immigration Detainer – Notice of Action, *available at* https://www.ice.gov/sites/default/files/documents/Document/2017/I-247A.pdf; *see also Galarza*, 745 F.3d at 643 ("[S]ettled constitutional law clearly establishes that [ICE detainers] must be deemed requests."). The form does not purport to grant authority to the law enforcement agency to which it is issued.

But even if the detainer did purport to subdelegate ICE's authority to the USMS, that subdelegation would be unlawful. An ICE detainer cannot, and does not, authorize the USMS to

15

exercise authority that Congress has not given it.  It is bedrock administrative law that while can agency may subdelegate authority to a *subordinate* agency or officer, an agency cannot, "absent evidence of contrary congressional intent," subdelegate authority to an "outside entity," including a coordinate federal agency.  *U.S. Telecom Ass'n v. FCC.*, 359 F.3d 554, 566 (D.C. Cir. 2004); *see also Louisiana Forestry Ass'n Inc. v. Sec'y U.S. Dep't of Labor*, 745 F.3d 653, 671 (3d Cir. 2014) ("[A] subdelegation of authority from the DHS to the DOL — an outside, non-subordinate agency — would be impermissible absent a clear statement from Congress authorizing such.").  But the INA provides no such "clear statement" permitting ICE to delegate its warrantless arrest authority to other agencies. Quite the opposite: the INA empowers with this authority only "officer[s] or employee[s] of *the Service*," or certain "officer[s] or employee[s] of a *State* or *political subdivision of a State*" that have entered into agreement with the Attorney General.  8 U.S.C. § 1357.  USMS officers are neither employees of ICE, nor employees of a State.  They are federal officials that are plainly excluded from wielding warrantless arrest and detention authority under the INA.

3. The USMS's authorizing statutes do not authorize USMS officers to make warrantless arrests for immigration violations.

This Court will find no support for the Marshals Service's sweeping claim of authority in the Marshals Service's enabling statutes.  Congress has endowed USMS officers with arrest power in a few delineated circumstances, none of which apply here.  To read the limited grants of authority to the Marshals Service as including the vast power to make warrantless arrests of suspected civil immigration violators would be an unprecedented and ahistorical expansion in the power of USMS officers.  And, that (incorrect) interpretation of the Marshals Service's authorizing statutes would dramatically disrupt the structure of immigration enforcement described above, in which only trained immigration officers may make such warrantless arrests.

16

There are three potential sources of arrest authority in the USMS authorizing statutes; none of them grant power to USMS officers to make warrantless arrests for civil immigration violations. Moreover, Congress's consistent historical delegation of specific civil law enforcement powers to the Marshals Service shows that USMS officers do not possess any freestanding common law powers.

a.   28 U.S.C. § 566(d)

The first relevant statutory provision grants authority to USMS officers to "make arrests without warrant for any offense against the United States committed in his or her presence, or for any felony cognizable under the laws of the United States if he or she has reasonable grounds to believe that the person to be arrested has committed or is committing such felony." 28 U.S.C. § 566(d); *see also* 18 U.S.C. § 3053 (same). This provision does not authorize Defendant's policy and practice for one simple reason: while it authorizes USMS officers to make warrantless arrests for *criminal* violations, it does not do so for *civil* offenses — such as the immigration violations alleged here.

The phrasing Congress used in Section 566(d) — "any offense against the United States committed in his or her presence" — refers to misdemeanor crimes. Read in context, Section 566(d) gives the Marshals Service the power to arrest an individual who commits a misdemeanor in the officer's presence, or an individual the officer has reasonable grounds to believe has committed or is committing a felony. This is the exclusive interpretation of Section 566(d) that federal and state courts have offered. *See, e.g.*, *Lucas v. United States*, 443 F. Supp. 539, 543 (D.D.C. 1977) (holding that USMS officer had authority to make a warrantless arrest "for the commission of the misdemeanor in his presence"), *aff'd*, 590 F.2d 356 (D.C. Cir. 1979); *Henrique v. U.S. Marshal*, 476 F. Supp. 618, 626 (N.D. Cal. 1979) (holding that a USMS officer lacked authority to make warrantless arrest of parole violator because "[a] parole violation is neither a misdemeanor nor a felony"); *People v. Lacey*, 30 Cal. App. 3d 170, 175 (Ct. App. 1973) (holding that a USMS officer "could make an arrest without

17

warrant for federal misdemeanors only if the same actually were committed in his presence"); *United States v. Nikparvar-Fard*, No. CR 17-513 (JED), 2017 WL 6731642, at *3 (E.D. Pa. Dec. 29, 2017) (interpreting Section 566(d) as authorizing marshals to "engage in or supervise the prevention, detection, investigation, or prosecution of any violation of Federal *criminal law*"). Reading Section 566(d) to refer to criminal misdemeanors and felonies makes abundant sense, as the language in Section 566(d) codifies the common law principle that a law enforcement officer "could not arrest without a warrant for a misdemeanor unless it were committed in his presence; but he could properly arrest if he had reasonable cause to believe that a felony had been committed." *United States v. Moore*, 18 C.M.R. 311, 319 (1955) (citing 18 U.S.C. § 3053); *Atwater v. City of Lago Vista*, 531 U.S. 315, 325-54 (2001) (recounting the development of the common law rule and its application to minor crimes); *see also District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) ("A warrantless arrest is reasonable if the officer has probable cause to believe that the suspect committed a *crime* in the officer's presence." (emphasis added)); D.C. Code § 23-581 (codifying the common law rule).

To read Section 566(d) otherwise — that is, as permitting USMS officers to make warrantless arrests for *any* civil violation committed in his or her presence — would lead to absurd results that fly in the face of Congress's intent. Congress cannot have contemplated that USMS officers, whose principal duties are "the execution of federal court orders, the provision of federal court security, and the custody of federal prisoners," *McNally v. DeWitt*, 961 F. Supp. 1041, 1044 (W.D. Ky. 1997), could make warrantless arrests for civil offenses. Did Congress intend the Marshals Service to make warrantless arrests for violations of the Migratory Bird Treaty Act of 1918, the Federal Mine Safety and Health Act of 1977, or the Clean Water Act? The answer must be no; to conclude otherwise would result in an upheaval of federal regulatory enforcement. Likewise, Congress did not intend to empower the Marshals Service to make warrantless arrests for violations of civil immigration statutes;

rather, Congress codified the traditional common law notion that law enforcement officers can make arrests for misdemeanors that they observe, or felonies that they have reasonable belief have been or are being committed.

### b.   28 U.S.C. 566(c)

The second relevant statutory provision provides that, "[e]xcept as otherwise provided by law or Rule of Procedure," USMS officers "shall execute all lawful writs, process, and orders issued under the authority of the United States." 28 U.S.C. § 566(c). But this provision does not apply here for several independent reasons. For one, this provision has never been read as a grant of authority to the Marshals Service; rather, this provision has only ever been applied to limit the discretion of the Marshals Service to *refuse* to enforce an order of a court. *See, e.g.*, *Ford*, 728 F.2d at 1370 (holding that Section 566(c) required the Marshals Service to comply with a writ of *habeas corpus ad testificandum*). Relatedly, Section 566(c) has only ever been invoked to refer to an order issued by a court — not by a law enforcement agency. *See, e.g.*, *Story v. Robinson*, 531 F. Supp. 627, 630 (W.D. Pa.) ("[T]he United States Marshal would not be free to disregard a writ of habeas corpus . . . ."), *aff'd*, 689 F.2d 1176 (3d Cir. 1982), *and aff'd sub nom. Appeal of Brooks*, 723 F.2d 896 (3d Cir. 1983), *and aff'd*, 723 F.2d 898 (3d Cir. 1983).

This interpretation makes sense: Section 566 expressly notes that the "primary role and mission" of the Marshals Service is to "enforce all orders of the United States District Courts, the United States Courts of Appeals, the Court of International Trade, and the United States Tax Court." 28 U.S.C. § 566(a); *see also* WRIT, Black's Law Dictionary (10th ed. 2014) (defining "writ" as "[a] court's written order"); PROCESS, *id.* (defining "process" as "[a] summons or writ, esp. to appear or respond in court"); ORDER, *id.* (defining "order" as "[a] command, direction, or instruction"). Finally, as discussed below, the Marshals Service cannot plausibly claim that any detainer issued by

ICE to the Marshals Service would constitute a writ, process, or order, because detainers are explicitly requests, and not orders or commands. *See Galarza*, 745 F.3d at 640 ("[A]ll federal agencies and departments having an interest in the matter have consistently described such detainers as requests.").

c. 28 U.S.C. § 564

The third relevant statutory provision grants USMS officers authority to "exercise the same powers which a sheriff of the State may exercise in executing the laws [of the United States]." 28 U.S.C. § 564. Section 564 does not govern the Marshals' authority here. While this statute grants USMS officers some authority, this particular statutory grant of power is limited, because it recognizes "a state's authority to decide how its own criminal justice system will operate." *United States v. Artis*, 315 F. Supp. 3d 1142, 1146 (N.D. Cal. 2018). "Even though federal law may authorize federal agents to act as state peace officers, each state retains the ability to limit the involvement of federal law enforcement in administering that state's criminal laws." *Id.* Thus, to understand whether the USMS have authority to arrest people for suspected immigration violations, the Court must understand the powers of "a sheriff of [the District of Columbia]." 28 U.S.C. § 564. Because District of Columbia law expressly withholds authority to make warrantless arrests for civil immigration violations, USMS officers cannot rely on Section 564 to justify their actions here.

Under District of Columbia law, the Metropolitan Police Department ("MPD") serves as the primary law enforcement agency for the District of Columbia. *See* D.C. Code §§ 5-101 *et seq*. The D.C. Code entrusts the Mayor of the District of Columbia with the duty to "preserve the public peace," to "prevent crime and arrest offenders," and to "protect the rights of persons and of property." D.C. Code § 5-101.03(1)-(3). The Mayor appoints the Chief of Police, D.C. Code § 5-105.01(a-1)(1), and also promulgates "rules" regarding the police that "shall constitute the law of the District," D.C. Code § 5-103.02.

The Mayor of the District of Columbia has promulgated rules that expressly limit the authority of MPD officers to arrest and detain individuals for suspected immigration violations. In 2011, the Mayor issued an executive order dramatically curtailing the authority of MPD officers. The Order explained that the "cooperation" of all people — including "those without documentation status" — "is needed to prevent and solve crimes and maintain public order, safety, and security in the entire community." D.C. Mayor's Order 2011-174, § II(A)(2). Because of this "clear need to foster trust and cooperation from the public," as well as "[t]he limited resources of the District, the complexity of immigration laws, limitations on authorities, [and] the risk of civil liability for immigration and enforcement activities," *id.* § II(A)(4), the Order established two relevant policies applying to MPD officers:

- "No person shall be detained solely on the belief that he or she is not present legally in the United States or that he or she has committed a civil immigration violation." *Id.* § II(B)(4).

- "Law enforcement officers shall not make arrests solely based on administrative warrants for arrest or removal entered by ICE into the National Crime Information Center ["NCIC"] database . . . including administrative immigration warrants for persons with outstanding removal, deportation, or exclusion orders." *Id.* § II(B)(5).

In accordance with this Order, MPD established internal rules requiring that officers "shall not arrest individuals solely based on administrative (civil) warrants of removal or arrest entered by ICE into NCIC." Metropolitan Police Dep't, Administrative Warrants in NCIC § I (2017). MPD rules further provide that "members shall not assist ICE agents in the arrest or transport of individuals solely based on administrative warrants." *Id.*

Section 564 provides that USMS officers may exercise the same powers that an MPD officer may exercise. Here, an MPD officer would not be able to make a warrantless arrest for a civil immigration violation. Moreover, as federal circuits have held, local police such as MPD do not have

authority to enforce federal immigration law. *See, e.g.*, *Santos v. Frederick Cty. Bd. of Comm'rs*, 725 F.3d 451, 464 (4th Cir. 2013) ("[L]ocal officers generally lack authority to arrest individuals suspected of *civil* immigration violations."). The Marshals Service thus cannot rely on Section 564 — or any of the other sources of the Marshals Service's authority — to justify its warrantless arrest of Plaintiff.

    4.  The "collective knowledge doctrine" does not apply to civil law enforcement matters.

Finally, Respondents cannot rely on the "collective knowledge doctrine" (which is sometimes called the "fellow officer rule"[5]) to make an end run around Congress's express scheme for federal civil immigration law enforcement. That rule provides that "[a] police officer may rely on a fellow officer's assessment of circumstances sufficient to warrant a suspect's arrest." *Barnhardt v. D.C.*, 723 F. Supp. 2d 197, 216 (D.D.C. 2010) (citing *United States v. Hensley*, 469 U.S. 221, 232 (1985)). But the collective knowledge doctrine comes out of, and applies only in, criminal law enforcement. *See Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 561 (1971) (establishing the rule that "police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause"); *see also* Wayne R. LaFave, 2 Search & Seizure § 3.5(b) (5th ed. 2018) ("[U]nder the *Whiteley* rule police are in a limited sense 'entitled to act' upon the strength of a communication through official channels directing or requesting that an arrest or search be made."). In *United States v. Hensley*, the Supreme Court's first case applying the collective knowledge doctrine, the Court expressly rationalized the rule as necessary to address changing

---

[5]  *See, e.g.*, *Michalik v. Hermann*, 422 F.3d 252, 260 n.7 (5th Cir. 2005) (using the terms interchangeably); *United States v. Brown*, 322 F. Supp. 2d 101, 105 (D. Mass. 2004) (same); *see also* Derik T. Fettig, *Who Knew What When? A Critical Analysis of the Expanding Collective Knowledge Doctrine*, 82 UMKC L. REV. 663, 664-65 n.4 (explaining that the terms are often used interchangeably by courts).

behaviors of "criminal suspects." 469 U.S. at 231.

Although regularly applied in criminal cases,[6] the collective knowledge doctrine has never been relied upon in this circuit in the administrative or civil context. When the collective knowledge doctrine applies in the criminal context, the arresting officer has may make an arrest, even if he or she relies on probable cause of another law enforcement officer. *See, e.g.*, *United States v. Chin*, 981 F.2d 1275, 1277 (D.C. Cir. 1992) (arresting officer was an Amtrak police officer authorized to make arrests). In the civil context, however, only certain specifically-delineated agents are authorized to detain persons for suspected civil violations. *See, e.g.*, 16 U.S.C. § 1377 (authorizing the Secretary of the Interior to "enforce the provisions" of the Marine Mammal Protection Act); 21 U.S.C. § 467d (authorizing the Secretary of Agriculture to enforce the Federal Food, Drug, and Cosmetic Act). Federal courts outside this district have acknowledged that because its history and narrow traditional application, transposing the rule to civil immigration enforcement would be incongruous. *See, e.g.*, *Ochoa v. Campbell*, 266 F. Supp. 3d 1237, 1258 (E.D. Wash. 2017) ("The collective knowledge doctrine does not apply in this case and the Court declines to extend it to the immigration context.").

But even if the doctrine did apply in the civil context, it would furnish only probable cause, not the authority to arrest. Applying this reasoning, at least four state appellate courts have recently rejected the argument that the collective knowledge doctrine can, via an ICE detainer, shore up a state law enforcement officer's authority to make an arrest. The New York Appellate Division explained:

> [E]ven if it is assumed that an ICE officer has probable cause to arrest for an immigration violation, the fellow officer . . . must still make a "lawful" arrest. If there is no authority to arrest for a civil matter, such arrest cannot be considered "lawful." To adopt the position advocated by the Sheriff here would permit state and local law enforcement to assume the authority of an ICE officer, though not granted by state

---

[6]     *See, e.g.*, *United States v. Bailey*, 622 F.3d 1 (D.C. Cir. 2010 (possession with intent to distribute cocaine); *United States v. Zimmerman*, 172 F.3d 922 (Table) (D.C. Cir. 1998) (stalking); *Sherrod v. McHugh*, 334 F. Supp. 3d 219 (D.D.C. 2018) (assault with a deadly weapon); *United States v. Gorham*, 317 F. sup. 3d 459 (D.D.C. 2018) (felon in possession of a firearm).

law, based upon nothing more than a request from ICE.

*People ex rel. Wells v. DeMarco*, 168 A.D.3d 31, 47 (N.Y. App. Div. 2018). Similarly, the District

Court of Colorado concluded, with respect to an immigration-related arrest, that

> even if this Court were to find the "fellow officer rule" applicable, it would not by itself resolve the issue in the Sheriff's favor. Even if the Sheriff personally had information that amounted to probable cause to believe that an individual is removable, he would still lack authority to make a warrantless arrest, since he would still lack probable cause that a *crime* had been committed.

*Cisneros v. Elder*, No. 2018-cv-30549 (EB), 2018 WL 5284263, at *3 (Colo. Dist. Ct. Mar. 19, 2018).

Likewise, state appellate courts in Minnesota and Massachusetts have concluded that immigration

detainers did not imbue state law enforcement officers with the power to effect warrantless arrests for

suspected civil immigration violations, notwithstanding the collective knowledge doctrine, where

state law did not independently confer such authority. *See Esparza v. Nobles County*, No. 53-VC-18-

751, 2019 WL 5494512, at *7 n.5 (Minn. Ct. App. Sept. 23, 2019); *Lunn v. Commonwealth*, 78 N.E.3d

1143, 1154-58 (Mass. 2017) (rejecting, in factual circumstances strikingly similar to those presented

here, the assertion that law enforcement possessed inherent authority to arrest a person suspected of

a civil immigration violation).

The few federal courts that have addressed this question have reached the same conclusion.

*See, e.g.*, *Ochoa*, 266 F. Supp. 3d at 1258. For instance, even while holding that the collective

knowledge doctrine could apply in the immigration context to extend probable cause to a local law

enforcement officer, the Fifth Circuit recently acknowledged that an ICE detainer could not, via the

collective knowledge doctrine, confer actual authority to make an arrest upon the officer. *See City of*

*El Cenizo v. Texas*, 890 F.3d 164, 188 (5th Cir. 2018). Rather, in that case it was a state statute, passed

by the Texas Legislature in 2017, that expressly "authorize[d] and require[d] state officers to carry

out federal [immigration] detention requests." *Id.* In the *El Cenizo* court's view, this clear statutory

grant of authority rendered cases like the Massachusetts Supreme Judicial Court's *Lunn v. Commonwealth*, where no statute existed, "easily distinguishable." *Id.*

Here, as in *Lunn*, *DeMarco*, and the other cases cited above — and unlike in *El Cenizo* — the relevant legislative body (Congress), has not conferred upon the USMS statutory authority to make warrantless arrests for suspected immigration violations. The Marshals Service cannot, therefore, transpose the collective knowledge doctrine from criminal law to justify their unlawful arrests for suspected civil immigration violations.

Similarly, the Marshals Service has no common law authority above-and-beyond its statutorily proscribed duties. Since Congress established the office of United States Marshal in the Judiciary Act of 1789, the powers of the Marshals have been carefully defined exclusively by statute. The Judiciary Act of 1789 empowered the Marshals to "execute . . . all lawful precepts directed to him, and issued under the authority of the United States." Judiciary Act of 1789, ch. 20, § 27, 1 Stat. 87. Just a year later, Congress expanded the power of the Marshals Service to administer and take the decennial census, Enumeration Act, ch. 2, § 1, 1 Stat. 101 (1790); in the Alien Act of 1798, Congress empowered the Marshals to "caus[e] a removal of [certain] alien[s] out of the territory of the United States," Act of July 6, 1798, ch. 66, § 3, 1 Stat. 577, 578. In the nineteenth century, Congress authorized the Marshals Service to confiscate property of the Confederacy, Confiscation Act of 1862, ch. 195, § 8, 12 Stat. 591, and then later gave the Marshals Service powers to supervise elections in response to threats from the Ku Klux Klan, Enforcement Act of 1871, ch. 99, § 8, Stat. 436. Notably, in 1878, Congress created a civil offense for cruelty to animals while in transit and authorized the Marshals Service to enforce the act. Act of March 3, 1873, ch. 258, § 2, 17 Stat. 585.

In the twentieth century, Congress continued to demonstrate that the Marshals Service possesses only the powers statutorily delegated to it. In 1925, Congress passed the Alaska Game

Law, authorizing USMS officers to seize "traps, nets, boats, dogs, sleds" used by hunters operating without a license in Alaska. Alaska Game Law, ch. 75, § 5, 43 Stat. 742 (1925). In the Agricultural Risk Protection Act of 2000, Congress again separately and explicitly authorized the Marshals Service to serve and execute warrants for civil violations of agricultural laws. Agricultural Risk Protection Act of 2000, ch. 158, § 421, 114 Stat. 449 (2000).

The sum thrust of this legislative history is that Congress has consistently, for decades, confirmed through its legislative enactments that the Marshals Service has authority to enforce civil law only when Congress expressly provides such authorization. In other words, if the Marshals Service had *sui generis* civil law enforcement authority, Congress would not have needed to authorize the Marshals Service in any of these statutes. Yet Congress did so, again and again, for decades, confirming that the Marshals Service has never, and does not, have common law civil law enforcement authority.

ii.      *Plaintiff is substantially likely to succeed on the merits of his APA claim.*

The Administrative Procedure Act requires that the Court "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction [or] authority." 5 U.S.C. § 706(2). As described *supra*, Plaintiff is substantially likely to succeed on this claim because the Marshals Service violates the APA by acting in excess of its statutory jurisdiction despite, as discussed above, neither the INA nor the Marshals Service's enabling statutes authorizing the actions it has taken against Plaintiff.

**B.  Plaintiff will suffer irreparable harm absent a preliminary injunction.**

If the Court finds that Plaintiff has shown a likelihood that their rights are being violated, it follows that Plaintiffs suffer irreparable harm. Plaintiff is currently being deprived their physical liberty. "Courts in this and other jurisdictions have found that deprivations of physical liberty of [analogous type] are the sort of actual and imminent injuries that constitute irreparable harm."

*Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 155 (D.D.C. 2018) (collecting cases).  Further, "where a plaintiff requests injunctive relief mandating that an agency comply with a process that, if completed could secure the plaintiff's freedom or could alleviate harsh conditions of confinement, the harm from detention surely cannot be remediated after the fact."  *Id.*

Specifically, Plaintiff and proposed class members suffer the harm of detention by the Marshals Service without authority — a harm to their liberty that cannot be remedied by money damages — and proposed class members will suffer ongoing violations of their rights as a result of the unlawful policy and practice of the Marshals Service.  Courts in this district have found irreparable harm in cases like the one here, where plaintiffs "seek injunctive and declaratory relief invalidating and setting aside the improper . . . policy" that causes detention of immigrants.  *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015); *see also Aracely, R.*, 319 F. Supp. 3d at 155 ("Courts have likewise recognized that the 'major hardship posed by needless prolonged detention' is a form of irreparable harm." (quoting *R.I.L-R*, 80 F. Supp. 3d at 191)).  Because Plaintiff and proposed class members are, and will continue to be unless an injunction issues, detained, the Court should find that Plaintiff suffers irreparable harm.

**C.  The balance of the equities and the public interest favor granting relief.**

In contrast to the harms that Plaintiff and the proposed class will suffer if Defendants are allowed to continue to exercise *ultra vires* authority, Defendants will not be harmed by an injunction.  Defendants have no legitimate interest in breaking the law by unlawfully detaining Plaintiff and the proposed class.  Accordingly, courts in this district have explained that "[t]he Government cannot suffer harm from an injunction that merely ends an unlawful practice."  *R.I.L-R*, 80 F. Supp. 3d at 191 (internal quotation marks omitted).  Because Defendants' policy of detaining people for suspected civil immigration infractions is outside the scope of their statutory authority, the

balance of equities tips against Defendant. *See, e.g.*, *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (citations omitted and collecting cases).

## CONCLUSION

For the reasons explained above, Plaintiff respectfully requests that this Court issue a preliminary injunction preventing Defendants from making warrantless arrests on the basis of suspected civil immigration violations in Superior Court, until further orders are issued by this Court. Plaintiff also respectfully requests that this Court set a date for a hearing, pursuant to Local Rule 65.1(d).

Dated: January 14, 2020
      Washington, D.C.

                          Respectfully submitted,


                          /s/ Steven Marcus*_____

                          Steven Marcus (D.C. Bar # 1630882)
                          Public Defender Service
                          633 Indiana Avenue N.W.
                          Washington, D.C. 20004
                          Tel. 202-824-2524
                          Fax 202-824-2525
                          *smarcus@pdsdc.org*


In accordance with D.D.C. Local Civil Rule 83.2(g), the attorney whose name is marked with an asterisk above certifies that: (i) he is a member in good standing of the District of Columbia bar; (ii) he is representing a petitioner who is indigent within the meaning of Local Rule 83.2(g), at no cost to petitioner; (iii) he has never been subject to disciplinary complaint or sanction by any court or other disciplinary authority; (iv) he possesses a copy of the Local Rules of this District and is familiar with the rules generally and as they pertain to this proceeding.

Dated: January 14, 2020