## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

```
_____ x
                                  :
N.S., individually and on behalf of all others   :
similarly situated,                               :
      c/o The Public Defender Service             :
      for the District of Columbia                :
      633 Indiana Avenue, N.W.                     :
      Washington, D.C. 20004                       :
                                                   :
                                                   :
                Plaintiff,                          :
                                                   :
          v.                                       :   Civil Action No. _____
                                                   :
MICHAEL A. HUGHES, United States                   :
Marshal, District of Columbia (Superior Court),    :
in his official capacity                           :
      Superior Court for the District of Columbia  :
      500 Indiana Ave., N.W.                        :
      Washington, D.C. 20001                        :
                                                   :
                Defendant.                          :
_____ x
```

### MOTION FOR CLASS CERTIFICATION

Plaintiff N.S., on behalf of the proposed class, respectfully moves pursuant to Federal Rules

of Civil Procedure 23(a) and 23(b)(2) for an order certifying a class defined as:

> All indigent criminal defendants in the Superior Court for the District of Columbia:
> (1) who were, are, or will be detained by officers of the United States Marshals
> Service for suspected civil immigration violations, and (2) as to whom Immigration
> and Customs Enforcement has not effectuated a warrant of removal/deportation (a
> form I-205) and/or has not obtained an order of deportation or removal.

As explained in the accompanying Memorandum of Law, class certification is appropriate under

Federal Rule of Civil Procedure 23(b)(2) because (1) joinder of all class members is impracticable,

(2) the class presents common questions of law and fact, (3) the claims of Class Representative

are typical of the claims of the members of the putative class, (4) Class Representative and his

attorney are adequate representatives for the putative class, and (5) Defendant has acted or refused to act on grounds that apply generally to the class.  Plaintiff's Motion is based upon this Motion; the attached Memorandum of Law; the concurrently filed declarations; all pleadings and papers on file with the Court in this action; and all other matters as may be presented to the Court at or before any hearing on this Motion.

Dated: January 14, 2020
      Washington, D.C.

                               Respectfully submitted,

                               /s/ Steven Marcus*_____

                               Steven Marcus (D.C. Bar # 1630882)
                               Public Defender Service
                               633 Indiana Avenue N.W.
                               Washington, D.C. 20004
                               Tel. 202-824-2524
                               Fax 202-824-2525
                               *smarcus@pdsdc.org*

In accordance with D.D.C. Local Civil Rule 83.2(g), the attorney whose name is marked with an asterisk above certifies that: (i) he is a member in good standing of the District of Columbia bar; (ii) he is representing a petitioner who is indigent within the meaning of Local Rule 83.2(g), at no cost to petitioner; (iii) he has never been subject to disciplinary complaint or sanction by any court or other disciplinary authority; (iv) he possesses a copy of the Local Rules of this District and is familiar with the rules generally and as they pertain to this proceeding.

Dated: January 14, 2020

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

———————————————————— x
                           :
N.S., *individually and on behalf of all others* : 
*similarly situated*,                    :
     c/o The Public Defender Service   :
     for the District of Columbia      :
     633 Indiana Avenue, N.W.      :
     Washington, D.C. 20004        :
                           :
                           :
            Plaintiff,          :
                           :
            v.                :    Civil Action No. _____
                           :
MICHAEL A. HUGHES, United States    :
Marshal, District of Columbia (Superior Court), :
in his official capacity             :
     Superior Court for the District of Columbia :
     500 Indiana Ave., N.W.        :
     Washington, D.C. 20001        :
                            :
                            :
            Defendant.      :
———————————————————— x

## MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

       This case challenges the United States Marshals Service's ("USMS" or "Marshals Service") policy of detaining people suspected of civil immigration violations in the Superior Court of the District of Columbia ("Superior Court"). The named plaintiff N.S. was detained by a USMS officer after a judge of the Superior Court of the District of Columbia ("Superior Court") ordered plaintiff released on his own recognizance. Because Congress has denied officers of the Marshals Service the authority to detain people suspected of civil immigration violations, the Marshals Service arrested the plaintiff in violation of the Administrative Procedure Act ("APA").

Plaintiff seeks to certify the following class under Federal Rules of Civil Procedure 23(a) and 23(b)(2):

> All indigent criminal defendants in the Superior Court for the District of Columbia: (1) who were, are, or will be detained by officers of the United States Marshals Service for suspected civil immigration violations, and (2) as to whom Immigration and Customs Enforcement has not effectuated a warrant of removal/deportation (a form I-205) and/or has not obtained an order of deportation or removal.

The proposed class readily satisfies the requirements of numerosity, commonality, typicality, and adequacy in Rule 23(a). Critically, a class action lawsuit is the only procedural mechanism to challenge Defendant's unlawful and unconstitutional practice because of the inherently transitory nature of class members' injuries. Class members are only in the custody of the Marshals Service for a short time before they are transferred to ICE custody and thus are unable to commence — let alone see to conclusion — individual litigation that would result in relief.

The proposed class would include hundreds of individuals, including future class members, who are and will be regularly seized and detained by officers of the Marshals Service, which is sufficient to satisfy numerosity. The class raises common legal questions that will generate common answers, including whether the Marshals Service exceeds its statutory authority and violates the APA when it seizes and detains people for suspected civil immigration violations. Plaintiff's claims for the writ of *habeas corpus* and for injunctive and declaratory relief are typical of the proposed class — that is, other people who are or will be detained for suspected civil immigration violations. Plaintiff and the proposed class will also be adequately represented by a team of attorneys from the Public Defender Service for the District of Columbia.

Plaintiff's proposed class likewise satisfies Rule 23(b)(2) because Defendant has "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P.

23(b)(2). Because the Marshals Service routinely seizes and detains people in Superior Court suspected of civil immigration violations based on a general policy, Defendant is operating in a manner that is common to all proposed class members. The class as a whole is therefore entitled to an injunction enjoining Defendant from taking such actions and directing the release of all class members who have been detained. Accordingly, this Court should grant class certification under Rule 23(b)(2) for purposes of entering Plaintiffs' requested classwide preliminary and permanent injunctions.[1]

## BACKGROUND

After he was arrested on January 13, 2020, Plaintiff N.S. was arraigned on January 14, 2020, in Courtroom C-10 of the Superior Court for the District of Columbia before Magistrate Judge Hermann. At Plaintiff's arraignment, Magistrate Judge Hermann determined that Plaintiff would be released pending his next court appearance on January 27, 2020. Magistrate Judge Hermann imposed certain conditions of release on Plaintiff, including requiring Plaintiff to report to his probation officer and ordered that he appear on January 27, 2020 for his next hearing.

During Plaintiff's arraignment, the Marshals Service announced that Plaintiff had an "ICE hold." Accordingly, instead of releasing Plaintiff—as would happen in the ordinary course—USMS officers detained and seized Plaintiff, claiming that they suspected him of civil immigration violations. Plaintiff was shackled and then was stepped back into the cell block behind Courtroom C-10, instead of walking out of the front door of the courtroom, as would happen in the ordinary course of a person released on his own recognizance.

---

[1]    Plaintiff also requests that he be appointed Class Representative, and that undersigned counsel be appointed Class Counsel. *See* Fed. R. Civ. P. 23(a), (g).

Plaintiff N.S., a District of Columbia-area resident for eight years and father of a small infant child, was arrested in the afternoon of January 13, 2020. He was later transported to the Superior Court for the District of Columbia, where he is currently in the custody of the Marshals Service. In the afternoon of January 14, 2020, N.S. was arraigned before Magistrate Judge Hermann, who ordered N.S. released on his own recognizance, to return to court on January 27, 2020. In the ordinary case, N.S. would then be released from his shackles and would walk out of the courtroom door. In this case, however, the Marshals Service instead declared that N.S. has an "ICE hold" and detained — and is presently detaining — N.S. on suspicion solely of his civil immigration violations. Upon information and belief, the Marshals Service intends to transfer N.S. into the custody of Immigration and Customs Enforcement.

Plaintiff's experiences are representative of Defendant's practice of routinely seizing and detaining people, after they have been ordered released by a Magistrate Judge on a criminal case or after criminal charges are declined, for suspected civil immigration violations. Lawyers and advocates who represent people in Superior Court report this practice regularly occurring. *See* Catacalos Decl. ¶¶ 5-6, Ex. A; Vega Decl. ¶¶ 5, 7, Ex. B; D'Adamo Decl. ¶¶ 7, 9, Ex. C.

## ARGUMENT

A plaintiff whose suit meets the requirements of Federal Rule of Civil Procedure 23 has a "categorical" right "to pursue his claim as a class action." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010). To meet these requirements, the "suit must satisfy the criteria set forth in [Rule 23(a)] (*i.e.*, numerosity, commonality, typicality, and adequacy of representation), and it also must fit into one of the three categories described in subdivision (b)." *Id.* Plaintiffs' proposed class satisfies all four of these prerequisites, as well as the requirements for certification under Rule 23(b)(2).

4

This Court should certify the proposed class in keeping with the numerous court decisions certifying classes in similar actions challenging the authority of law enforcement agencies to make warrantless arrests for suspected civil immigration violations.  *See, e.g.*, *Moreno v. Napolitano*, No. 11-CV-5452 (JZL), 2014 WL 4911938 (N.D. Ill. Sept. 30, 2014); *Roy v. County of Los Angeles.*, No. 12-CV-9012 (BRO), 2016 WL 5219468 (C.D. Cal. Sept. 9, 2016); *Cisneros v. Elder*, No. 2018-CV-30549 (EB), 2018 WL 5284267 (Colo. Dist. Ct. May 01, 2018).

## I.    The Proposed Class Satisfies Rule 23(a)'s Requirements

### a.    Numerosity

Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).  "Demonstrating impracticability of joinder does not mandate that joinder of all parties be impossible — only that the difficulty or inconvenience of joining all members of the class make use of the class action appropriate."  *DL v. District of Columbia*, 302 F.R.D. 1, 11 (D.D.C. 2013) (citation omitted), *aff'd*, 860 F.3d 713 (D.C. Cir. 2017).  "There is no specific threshold that must be surpassed in order to satisfy the numerosity requirement; rather, the determination requires examination of the specific facts of each case and imposes no absolute limitations."  *Taylor v. D.C. Water & Sewer Auth.*, 241 F.R.D. 33, 37 (D.D.C. 2007) (citation omitted); *see also Thorpe v. District of Columbia*, 303 F.R.D. 120, 144 (D.D.C. 2014) ("There is no specified or minimum number of plaintiffs needed to maintain a class action." (citation omitted)).  Nevertheless, some courts in this district have found that a class is presumptively numerous enough to satisfy Rule 23(a)(1) if it includes forty or more members.  *See Garnett v. Zeilinger*, 301 F. Supp. 3d 199, 205 (D.D.C. 2018).  In any case, a "plaintiff need not provide the exact number of potential class members to satisfy the requirement, so long as there is a reasonable

basis for the estimate provided." *Lightfoot v. District of Columbia*, 246 F.R.D. 326, 335 (D.D.C. 2007).

The proposed class is sufficiently numerous. Plaintiff seeks relief on behalf of all indigent criminal defendants in Superior Court who are seized by the Marshals Service and who have been detained for certain suspected civil immigration violations. Although the Marshals Service has claimed that "the agency does not track how many people it has turned over to immigration authorities from [Superior Court]," *see* Peter Arthurn, *Man's Detention in D.C. Shows Limits of 'Sanctuary City' Status*, WASH. POST, Sept. 24, 2018, at B5, five of the approximately 200 attorneys who practice in Superior Court estimate that, collectively, more than forty of their clients have been detained by USMS officers in Superior Court for suspected civil immigration violations, *see* D'Adamo Decl. ¶ 40, Ex. C;[2] *see also* Martin Austermuhle, *Marshal Law: D.C. Is a Sanctuary City, But That Status Stops at the Courthouse Door* ("*Marshal Law*"), WAMU, Sept. 20, 2018 (estimating that in 2018, by September of that year, over 70 people were "picked up by U.S. Marshals" in Superior Court and transferred to ICE custody). One such attorney who has practiced in Superior Court for twenty-five years testified that the frequency of these unlawful arrests has increased in the past year. *See* Vega Decl. ¶¶ 2, 5, 7, Ex. B. The Capital Area Immigrants' Rights (CAIR) Coalition likewise estimates that of the detained immigration population that CAIR

---

[2]     This number likely represents only a fraction of the total, as there were nearly 12,000 criminal cases filed in Superior Court in 2018, *see* D.C. COURTS, STATISTICAL SUMMARY 8 (2018), and undocumented immigrants comprise, according to one analysis, 3.9 percent of the total population in Washington, D.C, *see* AM. IMMIGRATION COUNCIL, IMMIGRANTS IN THE DISTRICT OF COLUMBIA 2. (2017). Although there is a consensus among empirical researchers that immigrants break criminal laws a lower rate than other Americans, these statistics nevertheless indicate that the number of criminal defendants subject to unlawful detention by the Marshals Service may be significantly higher than estimated here.

volunteers and staff have interviewed, "approximately 65-98 people who were leaving the court in Washington D.C." were detained between 2016 and November 2019. White Decl. ¶ 13, Ex. D.

Here, the class will undoubtedly exceed forty members and is thus entitled to a presumption of sufficient numerosity. *See Garnett*, 301 F. Supp. 3d at 205. And additional factors commonly considered by courts when evaluating numerosity also compel the conclusion that class treatment is appropriate. These factors include "size of individual claims," "financial resources of class members," and "the ability of claimants to institute individual suits." *Coleman ex rel. Bunn v. District of Columbia*, 306 F.R.D. 68, 80 (D.D.C. 2015) (citation omitted). The proposed class, by definition, includes only indigent persons who cannot afford to bring individual actions. *See Colo. Cross-Disability Coal. v. Taco Bell Corp.*, 184 F.R.D. 354, 359 (D. Colo. 1999) (finding joinder impracticable where many class members could not afford to bring individual actions); *Jackson v. Foley*, 156 F.R.D. 538, 541-42 (E.D.N.Y. 1994) (finding joinder impracticable where the majority of class members came from low-income households, greatly decreasing their ability to bring individual lawsuits). And, upon information and belief of Class Counsel and declarants, proposed class members are detained for a short period of time before they are transferred into ICE custody. Proposed class members are therefore unable to file individual suits for declaratory relief during that short period of time.

Further, as undocumented people lacking legal status, proposed class members are also vulnerable and largely lack the knowledge, skills, and resources needed to understand — let alone assert — their rights on their own. *Cf. DL*, 302 F.R.D. at 11 (certifying a class of a school district's "youngest and most vulnerable pupils, many of whom are indigent and unable to obtain legal services"); *Coleman*, 306 F.R.D. at 80 (certifying a class of individuals who had lost their residential property in foreclosure proceedings prompted by imposition of property tax liens and tax sales, noting

that the members were "by definition, uniquely vulnerable"); *Leyva v. Buley*, 125 F.R.D. 512, 515 (E.D. Wash. 1989) (certifying class of migrant workers and citing class members' lack of sophistication, limited knowledge of the legal system, limited or non-existent English skills, and fear of retaliation). Moreover, the ability of proposed class members to secure legal representation to raise the claims presented here is greatly diminished once ICE transfers class members to an immigration detention facility. As a result, any doubt as to whether Rule 23(a)(1) is met should be resolved in favor of class treatment. *See Coleman*, 306 F.R.D. at 80 (finding numerosity satisfied, in part, because "the vulnerability of many members of the class renders their claims uniquely unsuited for individual prosecution.").

Joinder is also inherently impractical because of the unnamed, unknown future class members who will be seized by the Marshals Service such that they will become class members in the future. By definition, the proposed class could not join the future stream of class members because their number changes every day. Because the "the class seeks prospective relief for future class members, whose identities are currently unknown and who are therefore impossible to join," the Court should find "the numerosity requirement of Rule 23(a)(1) satisfied." *DL*, 302 F.R.D. at 11; *see also, e.g.*, *Colo. Cross Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1215 (10th Cir. 2014) ("[T]he fact that the class includes unknown, unnamed future members also weighs in favor of certification."); *Olson v. Brown*, 284 F.R.D. 398, 408 (N.D. Ind. 2012) ("[F]uture members make joinder inherently impracticable because there is no way to know who they will be" and "the inherently transitory nature of the class members makes their joinder in a single, non-class suit impossible, since only a portion of the class will have standing to bring their claims at any one time."). As the District Court explained in *DL*, 302 F.R.D. 1, "future members make joinder inherently impracticable because there is no way to know who they will be and the inherently transitory nature

of the class members makes their joinder in a single, non-class suit impossible, since only a portion of the class will have standing to bring their claims at any one time." *Id.* at 11. Given the increasing number of seizures in Superior Court described by practitioners and in the media, it is clear that the policy and practice challenged here is continuing.

### b. Commonality

Rule 23(a)(2) requires the existence of "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). At bottom, "[c]ommonality requires the plaintiff to demonstrate that the class members have suffered the same injury." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-50 (2011) (internal quotation marks omitted). This requirement is met if "a single aspect or feature of the claim is common to all proposed class members," *Bynum v. District of Columbia.*, 214 F.R.D. 27, 33 (D.D.C. 2003), and "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores*, 564 U.S. at 350. "What matters to class certification . . . is not the raising of common 'questions' — even in droves — but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Id.* at 350 (internal quotation marks omitted). Therefore, commonality is satisfied "where plaintiffs allege widespread wrongdoing by a defendant" such as "a uniform policy or practice that affects all class members." *DL*, 302 F.R.D. at 12 (quoting *DL v. District of Columbia*, 713 F.3d 120, 128 (D.C. Cir. 2013)); *see also R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 181 (D.D.C. 2015) ("As the D.C. Circuit recently explained, commonality is satisfied where there is a uniform policy or practice that affects all class members."); *Thorpe*, 303 F.R.D. at 145-46. Such suits "by their very nature often present common questions satisfying Rule 23(a)(2)." 7A WRIGHT, MILLER & KANE, FEDERAL PRACTICE & PROCEDURE § 1763 (3d ed. 2005).

Members of the proposed class all suffer the same injury as a result of what the Marshals

Service describes as a "policy": "The USMS detains individuals in its physical custody who are wanted on ICE detainers for an ICE agent to respond and take custody of the individual[.]" Austermuhle, *Marshal Law*, WAMU, Sept. 20, 2018. The claims brought by Plaintiff on behalf of the proposed class raise the common legal question of whether Marshals Service officers exceed their statutory authority and violate the APA when they enforce the policy of seizing people suspected of civil immigration violations.  Answering this question will "drive the resolution of the litigation," *Wal-Mart Stores*, 564 U.S. at 350: If Defendant prevails in demonstrating that USMS officers have the authority to make warrantless arrests for suspected civil immigration violations, Defendant will win this case; if Plaintiff succeeds in arguing that USMS officers lack such authority, Defendant will be liable and an injunction should issue.

Answering this common question is sufficient to satisfy Rule 23(a)(2)'s permissive standard. "[F]actual variations among the class members," such as whether the Marshals Service had in hand an I-247A detainer, or an I-200 "warrant" at the moment of seizure "will not defeat the commonality requirement, so long as a single aspect or feature of the claim is common to all proposed class members."  *See Bynum*, 214 F.R.D. at 33. "Even a single common question will do" to support a commonality finding.  *Wal-Mart Stores*, 564 U.S. at 359 (brackets and internal quotation marks omitted); *see also Vista Healthplan, Inc. v. Warner Holdings Co. III*, 246 F.R.D. 349, 357 (D.D.C. 2007) ("The commonality test is met when there is at least one issue, the resolution of which will affect all or a significant number of the putative class members.").

### c.  Typicality

Rule 23(a)(3) requires that the claims or defenses of the class representatives be typical of the claims or defenses of the class members.  The typicality requirement "ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate."  *Wal-Mart Stores*, 564

U.S. at 349. "A class representative satisfies the typicality requirement if the representative's claims are based on the same legal theory as the claims of the other class members and her injuries arise from the same course of conduct that gives rise to the other class members' claims." *Coleman*, 306 F.R.D. at 83 (internal quotation marks omitted). Under the rule's permissive standards, "[f]actual variations between the claims of class representatives and the claims of other class members claims do not negate typicality." *Bynum*, 214 F.R.D. at 34. "Rather, if the named plaintiffs' claims are based on the same legal theory as the claims of the other class members, it will suffice to show that the named plaintiffs' injuries arise from the same course of conduct that gives rise to the other class members' claims." *Id.* at 35.

The typicality requirement is met here, where the Plaintiff's "claims are based on the same legal theory as the claims of the other class members." *Bynum*, 214 F.R.D. at 34. As with commonality, the proposed class members all share the same claim that the USMS officers violated the APA and acted *ultra vires* when they seized and detained them. Each proposed class member has suffered the same injury (seizure and detention), based on the same government practice (Marshals Service officers' policy of enforcing civil immigration law), in violation of the same law (the APA) and in excess of the same statutory authority (acting *ultra vires* to the INA and the Marshals Service's enabling statutes). Because the facts and legal claims concerning Plaintiff's seizure and detention are typical of the proposed class, the typicality requirement is easily met here.

### d. Adequacy

The final requirement of Rule 23(a) is that "the representative parties will fairly and adequately protect the interests of the class." This requirement ensures that "the named representative must not have antagonistic or conflicting interests with the unnamed members of the class," and "the representative must appear able to vigorously prosecute the interests of the class through qualified

counsel." *Twelve John Does v. District of Columbia*, 117 F.3d 571, 575 (D.C. Cir. 1997). Both requirements are met here.

Plaintiff will fairly and adequately protect the interests of the proposed class. Plaintiff does not seek any unique of additional benefit from this litigation that may make his interest different from or adverse to those of absent class members. Instead, Plaintiff's aim is to secure injunctive relief that will protect themselves and the entire class from the Defendant's challenged practices and enjoin the Defendant from further violations. Nor does Plaintiff or Class Counsel seek financial gain at the cost of absent class members' rights. Accordingly, Plaintiff lacks any antagonism with the class, and his interests align squarely with the other proposed class members in obtaining injunctive and declaratory relief.

Moreover, Plaintiff's counsel will "vigorously prosecute the interests of the class." *Twelve John Does*, 117 F.3d at 575. Plaintiff's counsel has extensive experience with the factual and legal issues litigated in this case; likewise, the Public Defender Service has a significant and lengthy history of affirmative civil rights class litigation. *See, e.g.*, *Streicher v. Prescott*, No. 83-cv-3295 (BDP) (D.D.C.); *Jerry M. v. District of Columbia*, No. 85-cv-1519 (D.C. Super. Ct.); *Campbell v. McGruder*, No. 71-cv-1462 (D.D.C.).

## II.     The Proposed Class Satisfies the Requirements of Rule 23(b)(2).

In addition to satisfying the four requirements of Rule 23(a), Plaintiff also must meet one of the requirements of Rule 23(b) for a class action to be certified. Courts in this District have interpreted Rule 23(b)(2) to impose two requirements: "(1) that defendant's actions or refusal to act are 'generally applicable to the class' and (2) that plaintiffs seek final injunctive relief or corresponding declaratory relief on behalf of the class." *Bynum*, 214 F.R.D. at 37; *Disability Rights Water Council of Greater Wash. v. Washington Metro. Area Transit Auth.*, 239 F.R.D. 9, 28 (D.D.C. 2006). To satisfy Rule

23(b)(2), "it is enough to show that a defendant has acted in a consistent manner toward members of the class so that his actions may be viewed as part of a pattern of activity." *Bynum*, 214 F.R.D. at 37 (internal citation omitted). As the D.C. Circuit has recognized, "Rule 23(b)(2) was intended for civil rights cases." *In re D.C.*, 792 F.3d 96, 102 (D.C. Cir. 2015).

"The key to the (b)(2) class," the Supreme Court has explained, "is the indivisible nature of the injunctive or declaratory remedy warranted." *Wal-Mart Stores*, 564 U.S. at 360. Where "a single injunction or declaratory judgment would provide relief to each member of the class," the class may be certified under (b)(2). *Id.* For this reason, civil rights class actions such as this one are the paradigmatic Rule 23(b)(2) suits, as "they seek classwide structural relief that would clearly redound equally to the benefit of each class member." *Marcera v. Chinlund*, 595 F.2d 1231, 1240 (2d Cir. 1979), *vacated on other grounds sub nom. Lombard v. Marcera*, 442 U.S. 915 (1979); *see also Johnson v. Gen. Motors Corp.*, 598 F.2d 432, 435 (5th Cir. 1979); *Elliot v. Weinberger*, 564 F.2d 1219, 1229 (9th Cir. 1977) (explaining that an action to enjoin allegedly unconstitutional government conduct is "the classic type of action envisioned by the drafters of Rule 23 to be brought under subdivision (b)(2)"), *aff'd in pertinent part sub nom. Califano v. Yamasaki*, 442 U.S. 682, 701 (1979).

Specifically, this case challenges the Marshals Service's policy and practice of seizing and detaining people suspected of civil immigration violations in Superior Court. And the complaint seeks equitable relief that would prohibit the Marshals Service from exercising this *ultra vires* authority in the future. *See* Compl. ¶ XX. The requested injunctive relief would "provide relief to each member of the class." *Wal-Mart Stores*, 564 U.S. at 360. Thus, "certification of a (b)(2) class in this case is appropriate because the [Marshals Service's] conduct is 'such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" *DL*, 302 F.R.D. at 16 (quoting *Wal-Mart Stores*, 564 U.S. at 360).

13

Certification of the Proposed Class is also appropriate because the injunctive and declaratory relief it seeks is necessary to avoid mootness and facilitate enforcement of judgments. *See* WILLIAM B. RUBINSTEIN, 1 NEWBERG ON CLASS ACTIONS § 2:13 (5th Ed. 2013). Given the temporary nature of the proposed class members' detention and the transitory nature of the proposed class population, absent certification, enforcing any judgment entered by the Court will be difficult. Moreover, future class members are certainly entitled to the same rights as Plaintiff under federal law. Class-wide final injunctive and declaratory relief is therefore appropriate to avoid mootness and to facilitate enforcement of any judgment this Court may enter.

Accordingly, all the requirements of Rule 23 are met, and the Court should therefore certify the Proposed Class so that all similarly situated people may benefit from the injunctive relief sought.

## CONCLUSION

Plaintiff respectfully request that the Court grant this Motion and enter an order certifying the proposed class under Rule 23(b)(2); appoint Plaintiff as Class Representatives; and appoint Plaintiff's Counsel from the Public Defender Service as Class Counsel.

Dated: January 14, 2020
        Washington, D.C.

Respectfully submitted,

/s/ Steven Marcus*

Steven Marcus (D.C. Bar # 1630882)
Public Defender Service
633 Indiana Avenue N.W.
Washington, D.C. 20004
Tel. 202-824-2524
Fax 202-824-2525
*smarcus@pdsdc.org*

14

In accordance with D.D.C. Local Civil Rule 83.2(g), the attorney whose name is marked with an asterisk above certifies that: (i) he is a member in good standing of the District of Columbia bar; (ii) he is representing a petitioner who is indigent within the meaning of Local Rule 83.2(g), at no cost to petitioner; (iii) he has never been subject to disciplinary complaint or sanction by any court or other disciplinary authority; (iv) he possesses a copy of the Local Rules of this District and is familiar with the rules generally and as they pertain to this proceeding.

Dated: January 14, 2020

# Exhibit A

## DECLARATION OF DAMON CATACALOS

I, Damon Catacalos, make the following declaration based on my personal knowledge and declare

under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am an attorney appointed by the District of Columbia Court of Appeals under the Criminal Justice Act to represent indigent criminal defendants in the District of Columbia.

2. I have practiced criminal law in the Superior Court of the District of Columbia for nine years as a CJA panel member.

3. I regularly represent clients at arraignments in Courtroom C-10 of the Superior Court.

4. In the past year, I have witnessed people detained by United States Marshals Service officers in Superior Court for suspected civil immigration violations.

5. Over the course of my nine years of regular criminal defense practice in DC Superior court there have been numerous occasions where my clients have plead not guilty, been released by the court yet detained by the U.S. Marshalls as reportedly the client had an "ICE detainer" against them. There have been occasions when I have asked the Marshalls for copies of the detainer notice but was not provided with any paperwork.

6. I would estimate that I have witnessed 2 to 3 people detained in this manner in the past two years.

7. The policy and practice of the Marshals Service is continuing

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, based on my personal knowledge and experience. Executed in Washington, D.C., on June 20, 2019.

Damon Catacalos, Esq.

# Exhibit B

## <u>DECLARATION OF DAVID VEGA</u>

I, David Vega, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am an attorney appointed by the District of Columbia Court of Appeals under the Criminal Justice Act to represent indigent criminal defendants in the District of Columbia.

2. I have practiced criminal law in the Superior Court of the District of Columbia for 25 years.

3. I regularly represent clients at arraignments in Courtroom C-10 of the Superior Court.

4. In the past year, I have witnessed people detained by United States Marshals Service officers in Superior Court for suspected civil immigration violations.

5. On or about June 27, 2018, I represented an 18 year old non-citizen from El Salvador in courtroom C-10 who entered a plea off not guilty to one count of Simple Assault and one count of Possession of a Prohibited Weapon. The Court released my client on his personal recognicence. However, a representative of the Marshals Service promptly announced that my client had an ICE hold. I immediately requested a copy of the Detainer/hold and the same Marshal responded. "there is no paperwork." I looked at the Magistrate Judge and asked how could that be? The judge simple shrugged his shoulders and said, Mr. Vega you know that ICE matters are out of my control, I have no discretion in the matter, the hold must be honored by the Court." This is not the first time that this scenario has unfolded for me regarding one of my non-citizen clients in C-10 and, if nothing is done about the Marshals detaining defendants on what is in essence a civil and not criminal matter, I suspect that it will not be the last. This one particular client was held at Farmville -- an ICE detention center -- for over 6 months. Meanwhile, my client had a U-visa petition pending in immigration Court, which meant that immigration was aware of his unlawful presence, and pending the outcome of his petition he was likely to obtain legal status to remain in the United States. Yet with a the help of the Marshals Service he was unjustly held. My client had no criminal record and the experience of being locked up for so long left him severely traumatized.

6. I would estimate that I have witnessed 3 people detained in this manner in the past year.

7. The policy and practice of the Marshals Service is continuing and in my opinion has increased in the past year.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, based on my personal knowledge and experience.

Executed in Washington, D.C., on 6.15.19

/s/ David Vega

_____

David Vega

# Exhibit C

## DECLARATION OF KATHRYN D'ADAMO
## IMMIGRATION STAFF ATTORNEY AT THE PUBLIC DEFENDER SERVICE

*I, Kathryn D'Adamo, certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1.    My name is Kathryn D'Adamo. I make these statements based upon my personal knowledge and review of email correspondence and communication with criminal defense attorneys practicing in the District of Columbia.

2.    I am the sole Immigration Attorney at the Public Defender Service for the District of Columbia (hereinafter "PDS") and have served in this role since August 2015. PDS is a federally funded, independent organization dedicated to representing indigent adults and children accused of crimes in the District of Columbia. My principal responsibility as Immigration Attorney at PDS is to advise trial attorneys at PDS and Court Justice Act appointed ("CJA") attorneys and their noncitizen clients of the immigration consequences of their pending criminal charges.

3.    PDS and CJA attorneys who are appointed to represent noncitizens in pending criminal matters can request my assistance to advise on the impact a criminal case will have on their noncitizen client's immigration status. They also reach out to me for assistance in communicating with their noncitizen clients when they are detained by immigration authorities, particularly when they are detained while their criminal charges are still pending pretrial.

4.    Individuals who are arrested for suspected criminal conduct in DC are typically fingerprinted and booked at the local police station. They are then taken to the Metropolitan Police Department's Central Cell Block located at 300 Indiana Ave. NW, Washington, DC. At the next opportunity, typically that same day or the following day, individuals are transported to the U.S. Marshal cellblock located in the basement of the DC Superior Courthouse to await a charging decision in their case. Prosecutors from either the U.S. Attorney's Office or the Office of Attorney General review the arrest paperwork and decide whether and what charges to file against the individual in DC Superior Court. If prosecutors elect not to file charges against the individual in court, the case is "no papered" and the individual is then typically released from the Marshal's cell block without ever seeing a judge. If prosecutors file charges against the individual in DC Superior Court, the case is considered "papered" and the individual then awaits arraignment and consideration of release by a magistrate judge in the C-10 courtroom located in the basement of DC Superior Court.

5.    It is my understanding that the U.S. Marshals typically run a warrant check on every individual who comes through the U.S. Marshal cellblock. If the check indicates there is an outstanding arrest warrant or detainer from another jurisdiction, the Marshals together

with the U.S. Attorney's office determine whether the warrant is extraditable. If the warrant is extraditable, it is my understanding that a fugitive case will typically be papered by the U.S. Attorney's Office. If it is not, the court is typically advised of the same when the individual is brought before the court for arraignment on their DC criminal charge. The magistrate judge in C-10 then arraigns the individual with the criminal charge that individual is facing, and makes a custody determination pursuant to DC's release statute under DC Code § 23-1321. If the individual is ordered released by the magistrate judge, they are unshackled by the U.S. Marshals and permitted to exit the courthouse through the front of the C-10 courtroom. If the individual is ordered held or otherwise have an out-of-state detainer, they remain shackled and are escorted by the U.S. Marshals back to the cellblock.

6.   Between beginning my position in August 2015 through the end of 2016, I recall being informed on one occasion that an individual represented by PDS was ordered released on his criminal charges by the magistrate judge in C-10, but still held by the U.S. Marshals pursuant to an "ICE hold." When this individual was ordered released by the magistrate judge, the U.S. Marshals announced that the individual had an "ICE hold" and stepped him back to the Marshal cellblock. That individual was held by the U.S. Marshals until ICE came to pick him up later that day, whereupon he was transferred into immigration custody for placement in removal proceedings.

7.   Starting around April 2017, I began to receive increasing reports that individuals who were ordered released on their pending criminal matters by the magistrate judges in C-10 were being held for and turned over to ICE by the U.S. Marshals from the U.S. Marshal cellblock. These reports typically came from panel attorneys who called or emailed me indicating that their client had been ordered released by the magistrate judge in C-10, but that the U.S. Marshals were holding them pursuant to an "ICE hold" or "ICE detainer." In many cases, I then assisted the attorneys in locating their client once they were transferred to ICE custody and in arranging to communicate with their client regarding their pending criminal case.

8.   There are approximately 200 CJA attorneys appointed to represent indigent clients in DC. Only a small percentage of panel attorneys regularly communicate with me, and even panel attorneys that do frequently request my assistance do not request my assistance on every case in which there are potential immigration consequences or in which their clients have been transferred to ICE by the U.S. Marshals.

9.   I have been personally informed by 5 CJA attorneys that at least 40 of their collective clients have been held for ICE by the U.S. Marshals in C-10 and turned over to ICE since 2017. One CJA attorney estimated that she has had approximately 15 clients turned over by the U.S. Marshals by ICE since 2017, and another estimated he had at least 10 clients who were turned over to ICE by the U.S. Marshals in C-10 since 2017. These numbers

include individuals whose cases were no papered, but who were nonetheless held by the U.S. Marshals for and turned over to ICE.

10. On December 20, 2019, I personally witnessed the U.S. Marshals detain a 20-year-old Salvadoran citizen and asylum seeker after his misdemeanor case was no papered pursuant to an ICE hold. This man had been arrested on December 19, 2019, and was detained at the Superior Court Marshal cellblock on December 20, 2019 pending a papering decision. His case was "no papered" by the government that morning, however the Marshals continued to detain him pursuant to an alleged "ICE hold," aware that he had no pending criminal charges. Defense counsel repeatedly asked the Marshals for a copy of the alleged ICE detainer, and the Marshals refused to provide any information regarding the same. Defense counsel and myself asked the Magistrate Judge to intervene and require the Marshals to turn over a copy of the ICE detainer, or at least to provide a copy to the individual being detained as required by the detainer form itself. After the Magistrate Judge spoke with one of the Marshals, a Marshal did provide me with the man's alien number and the phone number for a supervisor at ICE. Upon information and belief, the man was not provided a copy of an immigration detainer or any other information paperwork prior to his detention by ICE later that afternoon.

11. I have been informed by officers of the U.S. Marshals that the U.S. Marshals have a policy that they will hold an individual for whom they receive an ICE detainer "until the end of the day" for ICE as a professional courtesy.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

Executed on the 6th day of January 2020, in Washington, D.C.

Kathryn D'Adamo
Immigration Staff Attorney
Public Defender Service for DC
633 Indiana Ave. NW
Washington, DC

District of Columbia: SS
Subscribed and Sworn to before me
6th day of January 2020
Kecia S. Evans, Notary
My Commission expires June 30, 2021

# Exhibit D

DECLARATION OF KELLY WHITE
PROGRAM DIRECTOR FOR THE DETAINED ADULT PROGRAM AT THE CAPITAL
AREA IMMIGRANTS' RIGHTS (CAIR) COALITION

*I, Kelly White, make the following statements on behalf of the Capital Area Immigrants' Rights (CAIR) Coalition. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. My name is Kelly White, and I am over 18 years of age. I make these statements based upon my personal knowledge, review of business records CAIR Coalition creates and keeps in the ordinary course of our work, which I have access to by virtue of my management position at the organization. I am the Senior Program Director overseeing the Detained Adult Program (DAP) at the Capital Area Immigrants' Rights (CAIR) Coalition. CAIR Coalition is a Washington, DC-based nonprofit legal services organization. CAIR Coalition is the primary organization dedicated to providing legal services to indigent immigrant adults and children who are detained by the Immigration Customs Enforcement (ICE) agency under the Department of Homeland Security (DHS) or the Office of Refugee Resettlement throughout Virginia and Maryland.

2. The Capital Area Immigrants' Rights Coalition strives to ensure equal justice for all immigrant adults and children at risk of detention and deportation in the Capital region and beyond through direct legal representation, know your rights presentations, impact litigation, advocacy, and the enlistment and training of attorneys to defend immigrants.

3. CAIR Coalition is comprised of three main programs: the Detained Adult Program, the Detained Children's program, and the Immigration Impact Lab. The Detained Adult Program helps detained noncitizens learn to understand the Immigration Court and deportation process so they can make better-informed decisions about their cases. We also help people connect with pro bono attorneys if they are unable to pay an attorney to represent them. Our goal is to help families stay together and out of harm's way.

4. In the Detained Adult Program, CAIR Coalition has been operating a Legal Orientation Program (LOP) in Virginia since FY 2009 providing services to several facilities housing noncitizens in that state and expanded in FY 2016 to cover three facilities housing noncitizens in Maryland.

5. As part of the LOP, the Detained Adult Program routinely conducts jail visits with five detention facilities with contracts with ICE to house detained immigrants in civil custody. In Virginia, this includes visiting the Farmville Detention Center, which generally holds between 600-750 people, visiting the Caroline County Detention Center, which generally holds between 200-330 people, between once or twice a month. In Maryland, our jail visit services include visiting the Worcester County Detention Center, which generally holds between 150-200 people, visiting the Howard County Detention Center, which

generally holds between 90-120 people, and visiting the Frederick County Detention Center, which holds between 50-80 people, at least once a month.

6.  Our jail visits involve a full-day compact schedule, with the exception of Farmville and Caroline County, which require a two-day or four-day full compact schedule. During jail visits we provide informational "Know Your Rights" presentations about the immigration removal process to all newly booked detained immigrants, conduct intakes with anyone who is unrepresented and needs help, and provide *pro se* workshops so people learn to represent themselves. It is typical that at the end of our jail visit schedule for the week we would have conducted anywhere between 50-150 new intakes with people and followed up with 30-50 immigrants who have been in detention for several months but have requested some type of *pro se* or other legal assistance.

7.  CAIR Coalition relies on both full-time staff as well as volunteers in all 5 facilities to intake persons who are detained.  Volunteers assist on jail visits by filling out a 4 page intake form.  Volunteers attend a 2 hour jail visit training prior to visiting the facility.

8.  In addition to providing *pro se* assistance to detained immigrants in the Capital region, we also represent or connect people with pro bono attorneys. In 2018, we conducted intakes with 2,000 adults, and secured pro bono representation (with in-house or volunteer attorneys) for 301 detained immigrant adults and children. In the same year, we also held 58 *pro se* workshops and provided significant *pro se* assistance to 454 detained adults representing themselves in removal proceedings.

9.  CAIR Coalition uses a 4 page intake form that has evolved over the last 10 years.  On the current version of the form, CAIR Coalition staff and volunteers ask detained persons how ICE detained them prior to ICE detention.  There are nine (9) options:  (1) Home; (2) Airport; (3) Criminal; (4) Workplace; (5) Border; (6) Parole/Probation; (7) Shelter; (8) Street; (9) Court (Inside/Outside).  This is a "circle" option response.

10. The intake form includes a fill-in-the-blank option on date that ICE detained someone.

11. There is an additional section on "Arrest and Criminal History," that requires staff and volunteers to fill-out date, City/County/State, and additional information. These are fill-in-the-blank spaces.

12. The intake form also includes place of last residence before the person was detained. This is a drop-down-menu option in our data base, but a fill-in-the blank option on the form.

13. Between 2016 and November 2019, ICE detained approximately 65-98 people who were leaving the court in Washington D.C. based on intakes filled out by volunteers and staff, self-reported by persons in ICE detention.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

Executed on the 19th day of November, 2019, in Washington, D.C.

Kelly White
Senior Program Director
Detained Adult Program
CAPITAL AREA IMMIGRANTS' RIGHTS
(CAIR) COALITION
1612 K Street NW Suite 204
Washington, DC 20006