# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

N.S., *individually and on behalf of all others* )
*similarly situated*, )
         )
        *Plaintiffs*, )
         )
v. )      Case No. 1:20-cv-101-RCL
         )
MICHAEL A. HUGHES, *in his official* )
*capacity as U.S. Marshal for the District of* )
*Columbia Superior Court*, )
         )
        *Defendant*. )
_____ )

## MEMORANDUM OPINION

Plaintiff N.S.,[1] on behalf of the proposed class, requests a preliminary injunction under

Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 65 against defendant Michael A. Hughes in

his official capacity as United States Marshal for the District of Columbia Superior Court.

Plaintiff alleges that the United States Marshals Service ("USMS") is unlawfully seizing

individuals for suspected civil immigration violations despite its lack of authority to do so, thus

violating the Administrative Procedure Act ("APA"). Upon consideration of the motion (ECF

No. 4), opposition (ECF No. 16), reply (ECF No. 19), *amicus curiae* briefs (ECF Nos. 31 & 35),

and responses thereto (ECF Nos. 34 & 38), the Court will **GRANT** plaintiff's motion and

preliminarily **ENJOIN** defendant and defendant's subordinates, agents, and employees from

seizing individuals for suspected civil immigration violations. As explained below, deciding

whether to issue a preliminary injunction has necessarily forced the Court to consider the Motion

to Certify Class. Upon consideration of that motion (ECF No. 5), opposition (ECF No. 27), and

---

[1] Chief Judge Beryl A. Howell granted plaintiff's motion (ECF No. 1) to proceed under pseudonym, finding that his status as an undocumented individual could subject him to threats and harassment, and therefore his privacy interest outweighed the public interest in requiring disclosure of his identity. *See* ECF No. 2.

reply (ECF No. 29), the Court will **GRANT** the motion and certify the class. Furthermore, the Court will **DENY** as moot plaintiff's motion for expedited discovery (ECF No. 14). N.S. specifically requested expedited discovery to support his motion for a preliminary injunction, but the Court is already prepared to grant a preliminary injunction without that additional discovery.

## BACKGROUND

## I. PLAINTIFF N.S. & THE PROPOSED CLASS

Plaintiff N.S. was arrested on January 13, 2020. On January 14, 2020, plaintiff appeared before Magistrate Judge Heide L. Herrmann, who found that he was not a flight risk, posed no danger to the community, and could therefore be released on his own recognizance with orders to return to D.C. Superior Court on January 27, 2020. After being ordered released—but before he could leave the courthouse—USMS officers immediately detained him, claiming that N.S. had an "ICE hold." The USMS held him for at least two hours before transferring him to U.S. Immigration and Customs Enforcement ("ICE"). These facts are not contested, and defendant admits that it routinely detains anyone suspected of civil immigration violations after that person is either released by a judge or after the criminal charges are dropped.

Plaintiff believes that the USMS lacks the authority to make civil immigration arrests and brings this suit as a class action on behalf of all others who have been or will be subjected to this allegedly unlawful practice. Plaintiff seeks to certify the following class under Fed. R. Civ. P. 23(a) and (b)(2):

> All indigent criminal defendants in the Superior Court for the District of Columbia: (1) who were, are, or will be detained by officers of the United States Marshals Service for suspected immigration violations, and (2) as to whom Immigration and Customs Enforcement has not effectuated a warrant of removal/deportation (a form I-205) and/or has not obtained an order for deportation or removal.

ECF No. 5 at 2.

## II. THE UNITED STATES MARSHALS SERVICE

The USMS is a federal law enforcement agency within the Department of Justice and under the authority of the Attorney General. 28 U.S.C. § 564. Created by the Judiciary Act of 1789, the Marshals Service was initially an arm of the federal courts, but since 1861, officers have served at the behest of both the judiciary and the Attorney General. *See Pennsylvania Bureau of Correction v. U.S. Marshals Serv.*, 474 U.S. 34, 46 (1985) (Stevens, J., dissenting). The stated mission of the USMS is "to ensure the safe, effective functioning of the Federal judicial process." U.S. MARSHALS SERV., FY 2019 PERFORMANCE BUDGET 7 (2018). This mission is codified in 28 U.S.C. § 566(a), which states that the USMS's primary role is to "provide for the security and to obey, execute, and enforce all orders of the United States District Courts, the United States Courts of Appeals, the Court of International Trade, and the United States Tax Court, as provided by law." The USMS also possesses authority to "execute all lawful writs, process, and orders issued under the authority of the United States." 28 U.S.C. § 566(c). Additionally, a USMS officer may exercise the same powers granted to a sheriff of the State in which the officer is acting. *See* 28 U.S.C. § 564. Furthermore, the USMS "shall . . . exercise such other functions as may be delegated by the Attorney General." 28 U.S.C. § 561(b). The USMS is not permitted to act without authorization from a statute or regulation.

## III. ICE DETAINERS

ICE is a subcomponent of the Department of Homeland Security ("DHS"). Pursuant to the Immigration and Naturalization Act ("INA"), the Attorney General has promulgated regulations that allow specific immigration officers to issue an "Immigration Detainer-Notice of Action[] to any other Federal, state, or local law enforcement agency[.]" 8 C.F.R. § 287.7(a). A detainer:

> . . . serves to advise another law enforcement agency that the Department seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien. The detainer is a request that such agency advise the Department, prior to release of the alien, in order for the Department to arrange to assume custody, in situations when gaining immediate physical custody is either impracticable or impossible.

*Id.* Before issuing a detainer, an immigration officer "must establish probable cause to believe that the subject is an alien who is removable from the United States." *See* ICE Policy No. 10074.2 ¶ 2.4. The USMS admits that it "has a policy of cooperating with detainers and warrants issued by other law enforcement entities, including ICE detainers, and will 'coordinate the custody of the prisoner with the agency requesting custody.'" ECF No. 16 at 4-5 (quoting ECF No. 16-1 at 14).

## LEGAL STANDARDS

### I. PRELIMINARY INJUNCTION

A preliminary injunction is "an extraordinary remedy." *Winter v. Natural. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The movant must make a "clear showing that four factors, taken together, warrant relief." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (quoting *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016)). The four factors are: (1) a substantial likelihood of success on the merits, (2) that [the movant] would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

In the past, the D.C. Circuit has applied a "sliding scale" approach to the four factors, holding that injunctive relief "may be granted with either a high likelihood of success and some

injury, or *vice versa*." *Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985). The Supreme Court, however, essentially rejected the use of a "sliding scale" in *Winter*, holding that regardless of the movant's high likelihood of success on the merits, he still must "demonstrate that irreparable injury is *likely* in the absence of an injunction." 555 U.S. at 22. Although the D.C. Circuit has not directly spoken on the viability of the "sliding scale" post-*Winter*, District Courts have found that it is no longer applicable. *See, e.g.*, *Singh v. McConville*, 187 F. Supp. 3d 152, 160 (D.D.C. 2016) (citing *Winter* in holding that a movant must show that irreparable injury is "likely" regardless of the movant's high likelihood of success on the merits). The Supreme Court has clearly spoken on this issue, and this Court will thus apply the standard set forth in *Winter*—N.S. must clearly establish all four factors and cannot simply lean on the first factor.

## II. CLASS CERTIFICATION

Fed. R. Civ. P. 23(a) contains four threshold requirements for any class action: (1) joinder of all class members is impracticable; (2) the class presents common questions of law and fact; (3) the claims of Class Representative are typical of the claims of the members of the putative class; and (4) Class Representative and his attorney are adequate representatives for the putative class. Fed. R. Civ. P. 23(a)(1)-(4). There are two additional requirements to certify a class under Fed. R. Civ. P. 23(b)(2): (1) defendant's actions or refusal to act are generally applicable to the class; and (2) plaintiff seeks final injunctive relief or corresponding declaratory relief on behalf of the class. *Bynum v. District of Columbia*, 214 F.R.D. 27, 37 (D.D.C. 2003). It is plaintiff's burden to show that all of these requirements are met.

## ANALYSIS

## I. FACTOR 1

Plaintiff has demonstrated that he is likely to succeed on the merits by showing that his claim is not moot and that the USMS lacks legal authority to make civil immigration arrests. The APA requires courts to "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction [or] authority." 5 U.S.C. § 706(2)(C). The first factor thus turns in his favor.

### A. Plaintiff's Claim is Not Moot.

Article III of the Constitution limits federal courts to deciding "actual, ongoing controversies," meaning that courts have no jurisdiction over claims that are moot. *Honig v. Doe*, 484 U.S. 305, 317 (1988). The USMS argues that plaintiff's claim is moot and therefore unreviewable because he has already been transferred to ICE and thus is no longer in the Marshals Service's custody. Plaintiff is correct that defendant's failure to cite *Gerstein v. Pugh*, 420 U.S. 103 (1975), is "revealing."[2] ECF No. 19 at 18. In fact, defendant's opposition to the motion for a preliminary injunction fails to cite any cases at all to support its mootness argument (aside from those setting forth the rudimentary principles of the mootness doctrine). *See* ECF No. 16 at 13. The Court agrees with plaintiff that *Gerstein* and its progeny apply here, meaning that the case is not moot.

In *Gerstein*, the plaintiff sought to represent a "class of persons detained without a judicial probable cause determination." 420 U.S. at 110, n.11. By the time the District Court could rule on the motion to certify the class, however, it was not clear whether the named

---

[2] The Court is troubled by defendant's initial failure to acknowledge *Gerstein's* existence. The *Gerstein* exception is a fundamental part of the mootness doctrine, and defendant should have brought *Gerstein* to the Court's attention when it first raised the mootness issue in its opposition to the preliminary injunction. Instead, defendant waited for plaintiff to cite *Gerstein*, and then attempted to argue that *Gerstein* was inapplicable in its opposition to the motion for class certification.

plaintiff was "still in custody awaiting trial." *Id.* The Supreme Court found that the unique circumstances of that case warranted an exception—if the Court found the case to be moot simply because the plaintiff was no longer in custody, no named plaintiff would ever "be in pretrial custody long enough for a district judge to certify the class" because "pretrial detention is by nature temporary, and it is most unlikely that any given individual could have his constitutional claim decided on appeal before he is either released or convicted." *Id.* Despite no longer being in custody, the Court found that he "could nonetheless suffer repeated deprivations," as would others in his same situation. *Id.* Therefore, to prevent the case at hand from being entirely unreviewable, the Supreme Court invoked an exception to the mootness doctrine. Subsequent case law confirms the importance of *Gerstein* in preventing cases from being unreviewable simply because the harm lasts only for a short duration. For example, in *Cty. of Riverside v. McLaughlin*, the Supreme Court explained:

> That the class was not certified until after the named plaintiffs' claims had become moot does not deprive us of jurisdiction. We recognized in *Gerstein* that '[s]ome claims are so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires.'

500 U.S. 44, 52 (1991) (quoting *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 399 (1980)).

The *Gerstein* exception is extremely important in this case. N.S. was in the custody of the USMS at the time that he filed his Complaint, but the Marshals Service only detained him for a few hours. The same is true of the purported class members, as the USMS admits that it maintains an ongoing policy and practice of *briefly* detaining people before transferring them to ICE. Such a claim could never be adjudicated in a matter of hours. To hold that this claim is moot would thus be to hold that the actions of the USMS with respect to civil immigration arrests are entirely unreviewable. Such an outcome is unacceptable. The Supreme Court issued its holding in *Gerstein* for the express purpose of preventing the mootness doctrine from

7

shielding law enforcement from judicial review, and this Court finds that holding applicable here.

Even though N.S.'s claim on its own would be moot, he has brought this lawsuit as a class action. This means that as long as plaintiff is able to achieve class certification, his claim will not be dismissed as moot. For the reasons set forth later on in this Memorandum Opinion, the Court will grant N.S.'s motion for class certification. Defendant argues that class certification still does not prevent mootness because the USMS does not have at least one class member in its custody at all times. *See* ECF No. 27 at 9. Defendant's argument, however, is flawed. It is true that in *Gerstein* there was always some person suffering a deprivation, 420 U.S. at 110, n.1, but the Court never made that an actual requirement for *Gerstein* to apply. Therefore, this class action is certifiable, and N.S.'s claim is not moot. The Court will thus proceed with analyzing the merits of the claim.

### B. Plaintiff Has Shown That the USMS Lacked the Requisite Legal Authority to Detain Him.

The underlying facts of this case appear to be relatively undisputed, meaning that plaintiff's claim is a pure question of law for the Court to resolve.[3] The Court finds that N.S. has proven that the Marshals Service lacked the necessary authority to detain him. Defendant makes numerous arguments to the contrary, but as explained below, plaintiff has successfully refuted each one.[4]

---

[3] The Court finds that both parties have adequately briefed the legal issues, making a hearing unnecessary.

[4] Both parties reference the "collective knowledge doctrine," which provides that "[a] police officer may rely on a fellow officer's assessment of circumstances sufficient to warrant a suspect's arrest." *Barnhardt v. District of Columbia*, 723 F. Supp. 2d 197, 216 (D.D.C. 2010). Defendant, however, is not actually invoking the "collective knowledge doctrine" as a legal basis for the arrests. Therefore, any dispute about whether the "collective knowledge doctrine" applies in the civil immigration context is irrelevant. The Court will refrain from deciding any question not properly before it, and thus the issue will not be discussed further in this Memorandum Opinion.

*1. The USMS's Actions With Respect to N.S. and the Proposed Class Members Constitute Seizures.*

Defendant attempts to argue that the USMS does not actually "arrest" or "detain" proposed class members before transferring them to ICE. *See* ECF No. 16 at 9. Defendant asserts two potential bases for finding that the USMS did not actually arrest N.S., neither one of which is compelling.

Defendant's first argument is that because N.S. had been in the custody of the Marshals Service during his hearing in Superior Court, continuing to hold him after that hearing was not actually an arrest. It is true that N.S. was properly in the custody of the USMS during his hearing before Magistrate Judge Herrmann. The moment that Magistrate Judge Herrmann ordered him to be released on his own recognizance, however, the USMS's justification for holding him ended, and a new legal basis was required to keep him in custody. *See, e.g.*, *Arizona v. United States*, 567 U.S. 387 (2012). The distinction that defendant attempts to draw between a "new" arrest and a mere continuation of custody is actually immaterial in this situation—what matters is that the *old* justification for holding N.S. expired, and a *new* justification was needed either to continue holding him or to make a new arrest.

An analogy to a traffic stop is useful here. Imagine that a police officer stops a car for speeding. Speeding provides a clear justification for stopping a car, but once the officer has concluded all business related to the speed-limit violation, that justification ends. If the officer either wants to extend the stop beyond speed-limit-related matters (the equivalent of the USMS extending custody) *or* wants to pull the car over again a few minutes later (the equivalent of the USMS making a new arrest), that officer will need a new justification for doing so. When Magistrate Judge Herrmann released N.S. on his own recognizance, the old justification for holding him ended, and a new one was required to prevent him from leaving the courthouse. It

does not matter whether this was technically a new arrest or a mere extension of custody—in either scenario, the USMS still needed a new justification for the seizure. Therefore, defendant's argument that this was not a "new" arrest is irrelevant, as the USMS still needed some legal basis to continue holding N.S. after he was ordered released on his own recognizance. As explained in subsequent parts of this Memorandum Opinion, neither the ICE detainer nor any enabling statute provides that basis.

Defendant's second argument appears to be that the USMS officers' actions constituted mere "[c]ooperation with a detainer" rather than an actual seizure.[5] ECF No. 16 at 9. ICE detainers, however, are mere requests. By adopting a policy that categorically chooses to honor ICE's requests, the Marshals Service has willingly decided to detain individuals even when they are released by federal judges or are not charged with any crime. Defendant's convoluted argument that it was ICE rather than the USMS that actually effectuated the detention is illogical—an ICE detainer is not a *carte blanche*, and the USMS's actions are not automatically attributable to ICE simply because a detainer existed. Defendant cites *United States v. Al Nasser*, 555 F.3d 722 (9th Cir. 2009), in an effort to prove otherwise, but that case bears little resemblance to this one. In *Al Nasser*, the Ninth Circuit determined that a person was not actually seized because a reasonable person under those circumstances would have believed that he was free to leave. 555 F.3d at 731. In contrast, no reasonable person in N.S.'s position would have believed himself free to leave. Despite having been ordered released on his own recognizance—which should have permitted him to leave the courthouse—the Marshals Service

---

[5] In the Court's experience with the USMS over the years, it has noticed that the U.S. Marshals are very careful to check for detainers before releasing persons in their custody because of the Interstate Agreement on Detainers Act (PUB.L. NO. 91-538, 84 Stat. 1397 (1970)). Although the Act did not apply to N.S., it does apply to many people in the USMS's custody, so the Court understands why the Marshals Service has a general policy of checking for detainers before releasing anyone.

shackled N.S. and took him to a cell where he was held for at least two hours while awaiting transfer to ICE. The USMS is not ICE's puppet—it acted of its own accord in complying with ICE's request, and defendant's arguments to the contrary are unavailing.

### 2. ICE Detainers Do Not Provide the USMS With Legal Authority to Make Civil Immigration Arrests.

The first source of authority that defendant points to as providing the USMS with the necessary authority to make civil immigration arrests is an ICE detainer. As ICE itself has admitted, however, ICE detainers do not confer upon the recipient agency the legal authority to make an arrest. ICE has specifically conceded this point in numerous cases. *See Gonzalez v. Immigration & Customs Enf't*, 416 F. Supp. 3d 995, 1016 (C.D. Cal. 2019) (noting ICE's concession that "a detainer itself does not provide the legal authority for a state or local officer to make a civil immigration arrest"); *Moreno v. Napolitano*, 213 F. Supp. 3d 999, 1005 (N.D. Ill. 2016) (noting ICE's concession in its summary judgment brief that an arrest based solely on an ICE detainer constitutes a warrantless arrest). Quite simply, the I-200 form accompanying the detainer is not a true warrant, as it is not issued by an independent judicial officer; instead, it is issued by an ICE agent, causing concerns about a lack of neutrality. *See Lopez v. Sessions*, No. 18-CV-4189, 2018 WL 2932726, at *14 (S.D.N.Y. June 12, 2018) (explaining that the I-200 form "does not require any neutral party to evaluate the warrant" and is instead "prepared for ICE agents, by ICE agents"). Although ICE is not a defendant in this case, ICE's admission that its own detainers fail to provide independent legal authority for a civil immigration arrest is not easily ignored. Additionally, "[a]ll Courts of Appeals to have commented on the character of ICE detainers" have "refer[red] to them as 'requests' or as part of an 'informal procedure'" rather than as actual grants of authority. *Galarza v. Szalcyk*, 745 F.3d 634, 640 (3d Cir. 2014) (collecting cases). Even the regulation defining a detainer states that "[a] detainer is a *request*[.]"

11

8 C.F.R. § 287.7(a) (emphasis added). The Court concurs with the general consensus that ICE detainers do not carry any inherent arrest powers.

In its response to the *amicus curiae* briefs, defendant cites 8 C.F.R. § 287.7(d) in an attempt to show that ICE detainers do provide the USMS with inherent arrest authority. Section 287.7(d) reads:

> Upon a determination by the Department [of Homeland Security] to issue a detainer for an alien not otherwise detained by a criminal justice agency, such agency shall maintain custody of the alien for a period not to exceed 48 hours, excluding Saturdays, Sundays, and holidays in order to permit assumption of custody by the Department.

What defendant fails to recognize, however, is that Section 287.7(d) does not change the fact that Section 287.7(a) defines an ICE detainer as a mere request, and Section 287.7(d) does not say anything about an ICE detainer somehow providing an independent basis of authority to make an arrest. Section 287.7 pertains to ICE's authority to issue a detainer, not to another agency's authority to act on an ICE detainer. Although ICE may be within its authority to issue a detainer, that does not mean the recipient agency is automatically authorized to make an arrest. *See, e.g.*, *Gonzalez*, 416 F. Supp. 3d at 1016 (explaining that when a law enforcement agency receives an ICE detainer, it is that agency's responsibility "to determine what authority or right they have to hold an individual" before complying). Essentially, the question of whether ICE has the authority to issue a detainer is separate from the question of whether the USMS has the authority to make an arrest pursuant to that detainer. To read Section 287.7(d) as a purported grant of power to detain a person based solely on an ICE detainer would be to read Section 287.7(d) as sanctioning a warrantless arrest.

Defendant cites *United States v. Vasquez-Benitez*, 919 F.3d 546 (D.C. Cir. 2019), to support the proposition that ICE detainers provide the USMS with the necessary legal authority

to make civil immigration arrests. *Vasquez-Benitez*, however, had nothing to do with the USMS's authority to extend custody pursuant to an ICE detainer. Instead, that case concerned the relationship between the Bail Reform Act, 18 U.S.C. § 3142, and the specific provision of the INA allowing for the detention of "removable aliens charged with illegal reentry," 18 U.S.C. § 3142(d). The D.C. Circuit held that ICE can lawfully detain a person who is ordered released under the Bail Reform Act because the INA gives ICE the authority to regulate criminal illegal reentry. *See Vasquez-Benitez*, 919 F.3d at 552. This case is simply not on point. The most notable difference is that in *Vasquez-Benitez*, ICE effectively "cut out the middleman." Instead of issuing a detainer asking another agency to detain a person on its behalf, ICE seized the person directly once he was released from the USMS's custody. The D.C. Circuit did find that the USMS was without authority to *prevent* ICE from taking the person into custody, but the case had nothing to do with an attempt by the USMS to *extend* custody based on an ICE detainer. N.S. is not challenging ICE's authority to make civil immigration arrests. Essentially, nothing in *Vasquez-Benitez* suggests that ICE detainers alone give the USMS authority to make civil immigration arrests, meaning that defendant's reliance on the case is misplaced.

Furthermore, the INA and its regulations make clear that only trained, certified immigration officers have the authority to make civil immigration arrests. *See* 8 U.S.C. § 1357(a) (giving this power to "officer[s] or employee[s] of the Service authorized under regulations prescribed by the Attorney General," with "the Service" referring to ICE); 8 C.F.R. § 287.7(b). The USMS certainly does not meet this qualification, and nothing in the INA suggests that Congress gave agencies the authority to delegate their power to make civil immigration arrests. This further undermines the notion that an ICE detainer constitutes a grant of authority for the

USMS to make a civil immigration arrest.[6] Congress has specifically given this authority only to

trained and certified immigration officers, and that limited grant of power must be respected.

Of course, if the USMS already had a valid basis to extend the seizure of N.S. beyond the

conclusion of the hearing, this case would be very different. Indeed, many of defendant's

arguments hinge on the assumption that this was not technically a new arrest and thus the USMS

somehow already had authority to keep N.S. in custody after the hearing. For example, defendant

expresses its concern that under plaintiff's interpretation, ICE could issue detainers only to other

immigration officers, "a restriction that would . . . eliminate the cross-agency cooperation that

detainers are intended to facilitate." ECF No. 16 at 9. This Court's ruling, however, does not

prevent the USMS from complying with an ICE detainer when a person is *already* properly

within the USMS's custody. Instead, this case stands for the proposition that an ICE detainer

*alone* does not provide an independent justification for either a new civil immigration arrest or

for an extension of custody. As explained above, the officers in this case needed a new

justification to keep N.S. under arrest after he was ordered released on his own recognizance.

Defendant would like the Court to believe that the question before it is whether the USMS has

the power to notify ICE or transfer a prisoner to ICE when the USMS has *already* properly

seized the prisoner, but plaintiff does not contest that issue. The question that this case actually

raises is whether an ICE detainer gives the USMS the power to keep someone under arrest who

would otherwise not be in the USMS's custody at all. Based on the relevant statutory language

---

[6] I-200 forms can only be issued to immigration officers, but U.S. Marshals are not immigration officers. 8 C.F.R. §287.5(e)(3) explains which immigration officers may execute arrest warrants and requires that all such officers "successfully complete[] basic immigration law enforcement training." Defendant does not attempt to argue that the U.S. Marshals have completed such training. Federal regulations further clarify that "[o]nly designated immigration officers are authorized to make an arrest." 8 C.F.R. §§ 287.8(c)(1), 236.1(b)(1). USMS officers do not fall within that category. It is also worth noting (as plaintiff aptly points out) that the detainer form specifically states, "The alien must be served with a copy of this form for the detainer to take effect." *See* ECF No. 3, Ex. A. As demonstrated by that facts of N.S.'s case, it does not appear that the U.S. Marshals have a policy of providing detainees with that form.

and the nature of ICE detainers, the Court cannot find any basis for saying that the Marshals Service has such broad power. To interpret the law in such a way would be to say that the Marshals Service can civilly arrest anyone, anywhere, simply because they have an "ICE hold." Such broad power does not comport with this Court's understanding of the USMS's traditional functions.

It is also important to note that nothing in this Memorandum Opinion prevents the USMS from notifying ICE that a person with an "ICE hold" is currently in (or was previously in) its custody. Therefore, although an ICE detainer alone does not provide a basis for arresting someone with an "ICE hold," this ruling does not stop the USMS from notifying ICE of that person's whereabouts, and ICE is still free to make the civil immigration arrest itself. Because detainers have traditionally been viewed first and foremost as requests for notification, this Court's holding does not interfere with the USMS's ability to utilize an ICE detainer for its traditionally intended purpose.

> ### 3. The USMS's Enabling Statutes Do Not Provide the USMS With Legal Authority to Make Civil Immigration Arrests.

The second source of authority that defendant points to as supposedly providing the Marshals Service with the necessary authority to make civil immigration arrests is the agency's enabling statutes. The history of the USMS shows that it cannot act without Congressional authorization, and the Court finds that the three statutory provisions defendant cites do not provide such authority.

*a. 28 U.S.C. § 564 Does Not Provide the USMS With Legal Authority to Make Civil Immigration Arrests.*

28 U.S.C. § 564 allows USMS officers to "exercise the same powers which a sheriff of the State may exercise in executing the laws of the United States."[7] In Washington, D.C., the Metropolitan Police Department ("MPD") is the equivalent of the state sheriff. It is not clear whether defendant is actually arguing that Section 564 authorizes civil immigration arrests; defendant instead may simply be arguing that plaintiff inappropriately cited Section 564 as prohibiting the Marshals from complying with ICE detainers. What plaintiff actually did, however, was argue that Section 564 was not a legitimate basis for N.S.'s arrest.[8] *See* ECF No. 4 at 20-22.

Even if defendant were arguing that Section 564 authorizes civil immigration arrests, that argument would clearly be invalid, as the MPD is expressly prohibited from detaining people for suspected civil immigration infractions. *See* D.C. Act 23-131 § 2 ("[a]bsent a judicial warrant or order, issued by a federal judge . . . or a federal magistrate judge . . . , the District of Columbia shall not . . . [h]old an individual in the District's custody after that individual would have otherwise been released"); D.C. Mayor's Order 2011-174, § II(B)(1, 4-5) (prohibiting any District law enforcement officers from detaining people based solely on a belief "that he or she has committed a civil immigration violation"); MPD Executive Order EO-17-010 (Mar. 24, 2017), § I (prohibiting the MPD from assisting ICE agents "in the arrest or transport of

---

[7] Of course, a U.S. Marshal's authority is not *limited* to that of a sheriff. Section 564 is simply one source of the agency's authority, with other provisions granting additional powers.

[8] The parties' confusion about the arguments regarding Section 564 likely arose because of this case's unique procedural posture. Because N.S. filed a motion for a preliminary injunction, he had to file the first motion and speculate as to what the USMS would use to justify its actions. Therefore, defendant likely mistook plaintiff's preemption of Section 564 as an argument that Section 564 prohibited the USMS's actions.

individuals solely based on administrative warrants"). Therefore, Section 564 is incapable of giving USMS officers the authority to make civil immigration arrests.[9]

> ### b. 28 U.S.C. § 561 Does Not Provide the USMS With Legal Authority to Make Civil Immigration Arrests.

28 U.S.C. § 561(b) authorizes the Attorney General to confer additional "functions" upon the "Director of the United States Marshals Service." One regulation promulgated under Section 561 authorizes "receipt, processing and transportation of prisoners held in the custody of a marshal or transported by the U.S. Marshals Service under cooperative or intergovernmental agreements." 28 C.F.R. § 0.111(j). Defendant, however, does not cite any such "cooperative or intergovernmental agreement[]" between the USMS and ICE or between the USMS and DHS. Of course, the USMS could enter into a cooperative agreement with either DHS or ICE, but because defendant can present no evidence that one currently exists, Section 0.111(j) is irrelevant.[10]

Another regulation that defendant cites authorizes the USMS to execute "Federal arrest warrants pursuant to rule 4 of the Federal Rules of Criminal Procedure, Federal parole violator warrants pursuant to section 4206 of title 18 U.S. Code, and Federal custodial and extradition warrants as directed." 28 C.F.R. § 0.111(a). This provision authorizes the USMS to enforce warrants issued by states and foreign sovereigns seeking the custody and return of a fugitive. In order for Section .0111(a) to apply in this case, an ICE detainer and the accompanying I-200 form must constitute a "Federal custodial and extradition warrant[]" that the USMS has been "directed" to serve. *Id.* That is clearly not the case. As previously explained, the I-200 form is

---

[9] In its *amicus curiae* brief in support of plaintiff, the District of Columbia further confirms that "District law does *not* permit its law enforcement officers to detain individuals solely for federal immigration purposes." ECF No. 35 at 1.
[10] Because it does not appear that a cooperative agreement currently exists, it would be inappropriate for the Court to speculate as to the validity of such a future agreement.

not issued to the USMS; rather, it is issued to "[a]ny immigration officer authorized pursuant to sections 236 and 287 of the [INA] and part 287 of title 8, Code of Federal Regulations, to serve warrants of arrest for immigration violations." ECF No. 3-1 at 6. As the Court has already noted, U.S. Marshals are not immigration officers, and they are certainly not the kind of specially trained immigration officers specifically authorized under the applicable provisions.

Furthermore, even if the I-200 form were directed at the USMS, it still would not be a "warrant" in accordance with Section 0.111(a). As previously explained, the "warrant" that accompanies the I-200 form is not a true warrant because it "does not require any neutral party to evaluate the warrant" and is instead "prepared for ICE agents, by ICE agents." *Lopez v. Sessions*, No. 18-CV-4189, 2018 WL 2932726, at *14 (S.D.N.Y. June 12, 2018). ICE has admitted in multiple cases that "being detained pursuant to an ICE immigration detainer constitutes a warrantless arrest." *Moreno*, 213 F. Supp. 3d at 1005 (noting ICE's concession of this point in its summary judgment brief); *see also Gonzalez*, 416 F. Supp. 3d at 1016 (noting ICE's concession that "a detainer itself does not provide the legal authority for a state or local officer to make a civil immigration arrest"). Therefore, because Sections 0.111(j) and 0.111(a) are both inapplicable, 28 U.S.C. § 561 does not provide the USMS with the authority to make civil immigration arrests as defendant claims.

> c. *28 U.S.C. § 566 Does Not Provide the USMS With Legal Authority to Make Civil Immigration Arrests.*

28 U.S.C. § 566(c) authorizes the USMS to "execute all lawful writs, process, and orders issued under the authority of the United States." Section 566(c) is the primary provision enabling the USMS to fulfill its central duty "to attend the district and circuit courts when sitting therein." Judiciary Act of 1789, ch. 20, §27, 1 Stat. 87. To effectuate this responsibility, the Judiciary Act of 1789 directed the USMS to "execute throughout the district, all lawful precepts directed to

18

him, and issued under the authority of the United States." *Id.* This directive has traditionally been understood to mean that the Marshals Service is authorized to enforce *court* orders. Such an understanding of Section 566(c) is confirmed by the fact that, shortly after passing the Judiciary Act of 1789, Congress passed separate legislation directing the USMS to enforce federal laws that were not court orders. *See, e.g.*, Enumeration Act, ch. 2, §1, 1 Stat. 101 (1790) (directing the USMS to administer and take the decennial census); Act of July 6, 1798, ch. 66, § 3, 1 Stat. 577, 578 (specifically authorizing the USMS to detain and remove certain immigrants from the United States in times of declared war). If the authority to enforce federal laws and directives other than court orders had been included in the Judiciary Act of 1789, there would have been no need to pass separate statutes granting these powers. Therefore, the Court must conclude that the Judiciary Act of 1789 was a grant of limited power enabling the USMS to enforce only court orders, and any authority to enforce non-court orders must be separately authorized.[11] Congress has chosen not to authorize the USMS to make civil immigration arrests, and the Court must respect that choice.

Defendant argues that to read Section 566(c) as authorizing the Marshals Service only to enforce court orders would make Section 566(a) redundant, and therefore Section 566(c) must be read as an authorization to enforce orders from any federal entity whatsoever. The Court disagrees. Section 566(a) reads:

> It is the primary role and *mission* of the United States Marshals Service to provide for the security and to obey, execute, and enforce all orders of the United States District Courts, the United States Courts of Appeals, the Court of International Trade, and the United States Tax Court, as provided by law.

---

[11] Even if Section 566(c) extended to orders from other federal entities, a detainer is not a writ, process, or order. As previously noted in this Memorandum Opinion, ICE detainers are "'requests' or . . . part of an 'informal procedure.'" *Galarza*, 745 F.3d at 640. Therefore, Section 566(c) still would not apply.

28 U.S.C. § 566(a) (emphasis added). Section 566(a) lacks any commanding language and instead reads like a "mission statement," just as the "mission statement" found in the Judiciary Act of 1789 explained that the duty of the USMS is "to attend the district and circuit courts." Judiciary Act of 1789, ch. 20, § 27, 1 Stat. 87. Section 566(a) was thus never intended to confer any actual power—that is the purpose of Section 566(c).[12] Therefore, reading Section 566(c) as a limited grant of power does not make Section 566(a) redundant, as Congress used Section 566(c) to effectuate the goals set forth in Section 566(a).[13]

For these reasons, the three provisions of the enabling statute that defendant cites do not authorize U.S. Marshals to make civil immigration arrests. Of course, if Congress wants the USMS to have such power, Congress can enact a statute to that effect. Likewise, if the Attorney General wants current statutory provisions to apply to the USMS, he can attempt to pass regulations to that effect. In the absence of any new statutes or regulations, however, the Court must find that the USMS is acting without legal justification when it detains members of the proposed class.

## II. FACTOR 2

N.S. has established that his own rights were violated when the USMS detained him after his hearing; however, the second factor requires irreparable *future* harm absent a preliminary

---

[12] The limited nature of Section 566(c) is also made clear in the 1948 legislation changing "lawful precepts" to "process and orders." Congress explained that this change was instituted "to conform to section 672 of this title, defining the duties of the marshal of the Supreme Court of the United States." H.R. Rep. 80-308, at A68 (1947). Section 672 authorizes the Supreme Court Marshal to "[s]erve and execute all process and orders issued by the Court." 28 U.S.C. § 672(c)(2). By tying the duties of Section 566(c) to the duties of the Supreme Court Marshal, Congress clarified that Section 566(c) refers specifically to court orders.

[13] It is also worth noting that the "mission statement" in Section 566(a) precedes the grant of power in Section 566(c). The fact that the directive in Section 566(c) comes *after* the non-commanding language in Section 566(a) makes it much more likely that Section 566(a) sets forth broad goals which are actualized in Section 566(c). If the order of these two Sections were reversed, it would be less logical to interpret Section 566(a) as a "mission statement."

injunction. It is possible that the USMS could detain N.S. again sometime in the future, but N.S. has not shown that this is *likely*. Therefore, plaintiff's ability to satisfy the second factor turns on whether proposed class members are likely to suffer future harm, thus requiring the Court to analyze whether class certification is warranted. For the reasons explained below, the Court will grant plaintiff's motion for class certification. Therefore, because the proposed class is likely to suffer irreparable harm absent an injunction, the second factor turns in plaintiff's favor.

### A. Unlawful Seizures Constitute Irreparable Harm.

"Deprivations of physical liberty" are the type of "actual and imminent injuries that constitute irreparable harm." *Aracely R. v. Nielson*, 319 F. Supp. 3d 110, 155 (D.D.C. 2018) (collecting cases). Additionally, "where a plaintiff requests injunctive relief mandating that an agency comply with a process that, if completed could secure the plaintiff's freedom or could alleviate harsh conditions of confinement, the harm from detention surely cannot be remediated after the fact." *Id.* Defendant would have the Court believe that because "the only harm that Plaintiff alleges that he and others suffer at the hands of USMS is a brief, hours-long detention in custody to facilitate a transfer to ICE," there is no irreparable harm. ECF No. 16 at 14. The Court rejects defendant's blatant attempt to minimize this harm. A deprivation of liberty that includes being shackled and detained is a serious infringement on one's personal freedoms, and the fact that class members are detained for only a few hours does not change that fact. The USMS does not contest the underlying facts of this case (i.e., that it routinely arrests people who would otherwise be free to leave Superior Court). This is precisely the type of harm that the second factor contemplates. Therefore, the Court finds that proposed class members are likely to suffer irreparable harm absent a preliminary injunction.

**B. Plaintiff Has Satisfied Fed. R. Civ. P. 23's Requirements for Class Certification.**

The Court finds that class certification is appropriate because, as required by Fed. R. Civ.

P. 23(a): (1) joinder of all class members is impracticable; (2) the class presents common

questions of law and fact; (3) the claims of Class Representative are typical of the claims of the

members of the putative class; and (4) Class Representative and his attorney are adequate

representatives for the putative class. Fed. R. Civ. P. 23(a)(1)-(4). Additionally, as required by

Fed. R. Civ. P. 23(b)(2): (1) defendants' actions or refusal to act are generally applicable to the

class; and (2) plaintiff seeks final injunctive relief or corresponding declaratory relief on behalf

of the class.

*1. Plaintiff Has Shown Numerosity Under Fed R. Civ. P. 23(a)(1).*

Fed. R. Civ P. 23(a)(1) requires plaintiff to show that "joinder of all members is

impracticable." Joinder does not have to be impossible—instead, plaintiff must show "only that

the difficulty or inconvenience of joining all members of the class make use of the class action

appropriate." *D.L. v. District of Columbia*, 302 F.R.D. 1, 11 (D.D.C. 2013), *aff'd*, 860 F.3d 713

(D.C. Cir. 2017). Although there is no specific minimum number of class members required to

establish numerosity, a class is presumptively numerous enough to satisfy the requirement if it

includes forty or more members. *See Garnett v. Zeilinger*, 301 F. Supp. 3d 199, 206 (D.D.C.

2018). A plaintiff need not provide the exact number of potential class members—a "reasonable

. . . estimate" will suffice. *Lightfoot v. District of Columbia*, 246 F.R.D. 326, 335 (D.D.C. 2007).

It is also important to note that numerosity is about much more than just the total number

of class members. In many cases, it is difficult to ascertain how many class members there will

be, and the question simply becomes whether the existence of unknown and unnamed future

class members would make joinder difficult. *See J.D. v. Azar*, 925 F.3d 1291, 1322 (D.C. Cir.

2019) (explaining that classes which include "future claimants generally meet the numerosity requirement due to the 'impracticality of counting such class members, much less joining them'") (quoting 1 William B. Rubsenstein, Newberg on Class Actions § 3:15 (5th ed. 2018)). This is especially true when plaintiff seeks injunctive relief. The numerosity requirement takes into account "financial resources of class members, the ability of claimants to institute individual suits, and requests for prospective injunctive relief which would involve future class members." *D.L.*, 302 F.R.D. at 11 (quoting *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993)). Joinder is impracticable if "proposed class members [would be] financially unable to fund litigation themselves." Newberg on Class Actions § 3:11. Therefore, although the numerosity requirement is often thought of in sheer numerical terms, its "core requirement is that joinder be impracticable," and "the presence of many class members" is not the only way to satisfy Fed. R. Civ. P. 23(a)(1). *Id.*

Plaintiff has shown that joinder of all class members would be impracticable. Defendant's interpretation of Fed. R. Civ. P. 23(a)(1) as a strict numerical threshold is incorrect. Plaintiff cannot establish the exact number of class members, but he is not required to do so. N.S. has, at a minimum, shown that there are likely more than just a handful of class members. Firstly, it is undisputed that over the past few years, ICE has been increasing the number of detainers that it sends to U.S. Marshals in Superior Court. Between Fiscal Years 2014 and 2016, ICE sent an average of twelve detainers per year, but between Fiscal Years 2017 and 2019, ICE sent an average of 125 detainers per year. *See* Transactional Record Access Clearinghouse, *Latest Data: Immigration and Customs Enforcement Detainers (ICE Data through September 2019)*, http://trac.syr.edu/phptools/immigration/detain/ (last accessed March 31, 2020). Of course, this data does not prove that every detainer was for someone who falls within this precise

class, but this data also does not include the people detained by the USMS without paperwork. *See* ECF No. 5, Ex. B, at ¶ 5.

Secondly, the sworn declarations that plaintiff included with his motion also make clear that the class is sizeable.[14] For example, the Declaration of Kathryn D'Adamo (the Immigration Attorney at the Public Defender Service for the District of Columbia) affirms that since 2017, at least forty clients of just five Criminal Justice Act ("CJA") attorneys were detained by the USMS after being released or having all charges dropped. CJA attorneys only represent indigent clients, so these clients likely do fall into the proposed class. Other CJA attorneys have also witnessed the USMS make numerous civil immigration arrests. *See, e.g.*, ECF No. 5, Ex. A, at ¶¶ 6-7; ECF No. 5, Ex. B, at ¶¶5-6. Although these declarations do not establish an exact number of class members, Fed. R. Civ. P. 23(a)(1) does not require an exact number. Defendant admits that the U.S. Marshals in Superior Court have an ongoing policy "of cooperating with detainers and warrants issued by other law enforcement entities, including ICE detainers" and "will hold the prisoner at the courthouse until the close of business" even if "the wanted suspect is released on all Superior Court charges." ECF No. 16 at 4-5. When taken together, all of this information suggests that the proposed class is likely quite sizeable.

Finally, in this specific case the unknown and unnamed future class members are even more important to the numerosity requirement than the total number of members. Defendant admits that the challenged practice is ongoing, but those who will be arrested for suspected civil immigration violations in the future cannot be joined at this stage. This case is thus similar to

---

[14] Defendant raises concerns about whether these declarations constitute hearsay. Courts, however, routinely accept declarations at the class certification stage. It is common practice to rely on these types of sworn statements, and defendant can point to no evidence of unreliability. Additionally, the numerosity requirement is about much more than just the total number of class members, so the Court would likely find that plaintiff met the numerosity requirement even without these declarations.

*J.D.*, where the Court found numerosity not because of the specific number of members, but because future class members were unknown and unnamed. *See* 925 F.3d at 1322; *see also Clarkson v. Coughlin*, 145 F.R.D. 339, 348 (S.D.N.Y. 1993) (granting class certification where plaintiff could identify "at least seven deaf or hearing-impaired female inmates" because "the composition of the prison population is inherently fluid"). Additionally, the proposed class is limited to indigents, meaning that bringing individual suits would be extremely difficult. Furthermore, as previously noted, the USMS's actions are essentially unreviewable without a class action, as no detainee could litigate his or her claim in a matter of hours. This makes joinder not just impracticable, but impossible—without a class action, there is no lawsuit at all, and the USMS could continue its unlawful practice indefinitely without ever facing judicial review. For these reasons, the Court finds that plaintiff has satisfied the requirements of Fed. R. Civ. P. 23(a)(1).

### 2. Plaintiff Has Shown Commonality Under Fed. R. Civ. P. 23(a)(2).

Fed. R. Civ. P. 23(a)(2) requires the existence of "questions of law or fact common to the class." This means that plaintiff must "demonstrate that the class members have suffered the same injury." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-50 (2011). This can be accomplished by showing that "a single aspect or feature of the claim is common to all proposed class members," *Bynum*, 214 F.R.D. at 33, and that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores*, 564 U.S. at 338. Commonality is satisfied "where plaintiffs allege widespread wrongdoing by a defendant" through "a uniform policy or practice that affects all class members." *D.L.*, 302 F.R.D. at 12 (quoting *D.L. v. District of Columbia*, 713 F.3d 120, 128 (D.C. Cir. 2013)).

Defendant does not contest that plaintiff has satisfied the commonality requirement. *See generally* ECF No. 27. The common question is whether the USMS has the authority to make civil immigration arrests. As previously explained, the answer is no, meaning that all class members suffer the same injury in the form of unauthorized restraints on physical liberty. Although the exact facts of each seizure may differ, the general legal question is the same, meaning that plaintiff has satisfied the commonality requirement as set forth in Fed. R. Civ. P. 23(a)(2).

### 3. Plaintiff Has Shown Typicality Under Fed. R. Civ. P. 23(a)(3).

Fed. R. Civ. P. 23(a)(3) requires that the claims or defenses of the class representative be typical of the claims or defenses of the class members. This requirement is satisfied if "the representative's claims are based on the same legal theory as the claims of the other class members and [if the class representative's] injuries arise from the same course of conduct that gives rise to the other class members' claims." *Coleman v. District of Columbia*, 306 F.R.D. 68, 83 (D.D.C. 2015) (citing *Bynum*, 214 F.R.D. at 35). Some factual variations between claims are permitted so long as the class representative's claim is based on the same allegedly unlawful conduct. *See Bynum*, 214 F.R.D. at 34.

Defendant does not contest that plaintiff has satisfied the typicality requirement. *See generally* ECF No. 27. Plaintiff's claims are based on the same legal theory as the claims of the other class members because all claims are based on the theory that the USMS lacks legal authority to make civil immigration arrests and is therefore violating the APA. Although the factual circumstances surrounding each case vary slightly, all proposed class members suffer the same injury as N.S.—unlawful detention by the USMS. Plaintiff has thus satisfied the typicality requirement as set forth in Fed R. Civ. P. 23(a)(3).

*4. Plaintiff Has Shown Adequacy of Representation Under Fed. R. Civ. P.
23(a)(4).*

Fed. R. Civ. P. 23(a)(4) requires that "the representative part[y] will fairly and adequately

protect the interests of the class." This requirement ensures that "the named representative [does]

not have antagonistic or conflicting interests with the unnamed members of the class" and

"appear[s] able to vigorously prosecute the interests of the class through qualified counsel."

*Twelve John Does v. District of Columbia*, 117 F.3d 571, 575 (D.C. Cir. 1997).

Defendant does not contest that N.S. will adequately represent the class, *see generally*

ECF No. 27, and plaintiff has submitted the following statement to this Court:

> Plaintiff does not seek any unique or additional benefit from this litigation that may
> make his interest different or adverse to those of absent class members. Instead,
> Plaintiff's aim is to secure injunctive relief that will protect themselves and the
> entire class from the Defendant's challenged practices and enjoin the Defendant
> from further violations. Nor does Plaintiff or Class Counsel seek financial gain at
> the cost of absent class members' rights. Accordingly, Plaintiff lacks any
> antagonism with the class, and his interests align squarely with the other proposed
> class members in obtaining injunctive and declaratory relief.

ECF No. 5 at 12. The Court sees no reason to doubt plaintiff's assertions. Furthermore, the Court

has no concerns about the ability of the Public Defender Service to litigate this case. Therefore,

plaintiff has demonstrated adequacy of representation as required by Fed. R. Civ. P. 23(a)(4).

*5. Plaintiff Has Shown That Defendant's Actions Are Generally Applicable to the
Class and That He Seeks Final Injunctive or Corresponding Declaratory Relief
on Behalf of the Class Under Fed. R. Civ. P. 23(b)(2).*

Fed. R. Civ. P. 23(b)(2) imposes two requirements: (1) that defendant's actions . . . are

generally applicable to the class; and (2) that plaintiff[] seek[s] final injunctive relief or

corresponding declaratory relief on behalf of the class. *Bynum*, 214 F.R.D. at 37. To satisfy this

rule, "it is enough to show that a defendant has acted in a consistent manner toward members of

the class so that his actions may be viewed as part of a pattern of activity." *Id.* The Supreme

Court has explained that the "key to the (b)(2) class is the indivisible nature of the injunctive or

27

declaratory remedy warranted." *Wal-Mart Stores*, 564 U.S. at 360. When "a single injunction or declaratory judgment would provide relief to each member of the class," the class is properly certified under (b)(2). *Id.*

Defendant does not contest that plaintiff has satisfied the requirements of Fed. R. Civ. P. 23(b)(2). *See generally* ECF No. 27. This case challenges the USMS's policy and practice of seizing and detaining people suspected of civil immigration violations in Superior Court and seeks equitable relief to prohibit the USMS from doing so in the future. The Court's determination that defendant lacks the authority to make civil immigration arrests provides the same relief to all class members, as it prevents a government agency from acting outside the scope of its authority. Therefore, this class is certifiable under Fed. R. Civ. P. 23(b)(2). Because the Court will grant class certification, proposed class members exist who are likely to suffer irreparable future harm, and the second preliminary injunction factor turns in plaintiff's favor.


## III. FACTOR 3

The third factor courts consider when deciding whether to grant a preliminary injunction is whether an injunction would substantially injure other interested parties. The "other interested parties" in this case are the USMS and ICE. Although the USMS and ICE would certainly prefer to continue the current practice of having the USMS make civil immigration arrests, a preliminary injunction would not cause actual harm. Convenient as it may be for both agencies to have the USMS make civil immigration arrests, the government has no legitimate interest in acting unlawfully. *See R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (explaining that "[t]he government 'cannot suffer harm from an injunction that merely ends an unlawful practice'") (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)). This is

especially true in this case where no underlying factual dispute affects the merits of plaintiff's claim—the only question is whether the USMS is acting outside the scope of its authority when it makes civil immigration arrests, which the Court has determined that it is. Therefore, the third factor clearly turns in plaintiff's favor.

## IV. FACTOR 4

The fourth factor requires that an injunction would further the public interest. The public has a clear interest in seeing that government officials do not exceed their statutory authority. The public also has an interest in ensuring that people (including any members of the public who could, in the future, fall within the proposed class) are not unlawfully arrested. There is no harm to the other interested parties contemplated under factor three, but there is great harm to anyone deprived of his or her physical liberty. The fourth factor thus turns in plaintiff's favor, meaning that a preliminary injunction is warranted.

## CONCLUSION

Based on the foregoing, the Court will **GRANT** plaintiff's motion for a preliminary injunction (ECF No. 4). Defendant and defendant's agents, subordinates, and employees will be preliminarily **ENJOINED** from seizing individuals for suspected civil immigration violations. It will be **ORDERED** that this preliminary injunction shall take effect immediately and shall remain in effect pending final resolution of this matter.

The Court will **GRANT** plaintiff's motion for class certification (ECF No. 5) and certify the following class:

> All indigent criminal defendants in the Superior Court for the District of Columbia:
> (1) who were, are, or will be detained by officers of the United States Marshals

Service for suspected civil immigration violations, and (2) as to whom Immigration and Customs Enforcement has not effectuated a warrant of removal/deportation (a form I-205) and/or has not obtained an order of deportation or removal.

The Court will also **DENY** as moot plaintiff's motion for discovery (ECF No. 14).

Although plaintiff will be permitted to file discovery motions in the future, plaintiff filed this

specific motion seeking expedited discovery to support his request for a preliminary injunction.

Because there is sufficient evidence to grant a preliminary injunction without expedited

discovery, ordering such expedited discovery would be unnecessary and improper.

A separate Order accompanies this Memorandum Opinion.

Date: May 7, 2020 _____ /s/ _____

Royce C. Lamberth
United States District Court Judge